**John Guzman TELLO, Appellant,**

v.

**The STATE of Texas.**

**No. PD–987–04.**

Court of Criminal Appeals of Texas.

Dec. 7, 2005.

Bruno A. Shimek, Bryan, for Appellant.

Douglas Howell, III, Asst. District Atty., Bryan, Matthew Paul, State's Atty., Austin, for State.

*OPINION*

HERVEY, J., delivered the opinion for a unanimous Court.

Appellant was towing some dirt in a homemade trailer when the trailer unhitched from appellant's truck, and struck and killed a pedestrian. As a result of this incident, a jury convicted appellant of criminally negligent homicide as charged in an indictment alleging that appellant caused the victim's death by "failing to properly secure a trailer to his truck." *See* TEX. PEN.CODE, § 19.05(a).

■ The Court of Appeals affirmed the conviction. *See Tello v. State*, 138 S.W.3d 487, 497 (Tex.App.-Houston [14th Dist.] 2004). Appellant claims that the evidence is legally and factually insufficient to support a finding that he was criminally negligent under TEX. PEN.CODE, § 6.03(d), which defines criminal negligence:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.[1]

The evidence shows that appellant towed the trailer with his truck on many occa-

---

1. The ground upon which we granted discretionary review asks "[w]hether the evidence

sions in his construction business. When appellant's trailer unhitched from his truck and struck and killed the victim, there were no safety chains securing the trailer to the truck as required by state law.[2] An accident investigator (Long) with the Bryan Police Department testified that safety chains would have prevented an unhitched trailer from detaching from the truck.

Q. [PROSECUTION]: In case the coupler gives way, then the chains hold the trailer to the truck?

A. [LONG]: They keep it connected as—Well, for lack of a better word, one unit. They are two pieces, but still connected together.

The evidence also shows that the ball (to which the trailer hitch attached) on the bumper of appellant's truck did not work properly. An accident reconstructionist (Sylvester) with the Bryan Police Department testified that this ball was loose and not tight against the bumper.

Q. [PROSECUTION]: Okay. After you marked them, then what did you do?

A. [SYLVESTER]: I marked them. I checked the trailer, the ball hitch on the bumper of the pickup truck. I looked at it, and it was loose. The bumper itself seemed to be in good shape. The ball was loose. It wasn't tight against the bumper. After that I began taking measurements—taking measurements to complete a detailed diagram of the scene.

Long testified that the loose ball on the bumper of appellant's truck wobbled and that this was not "a proper attachment of a ball to a bumper."

Q. [PROSECUTION]: What was its condition as far as being tight on the bumper or loose on the bumper?

A. [LONG]: The ball itself was loose, but the nut was as tight as it could have been.

Q. When you say the ball was loose, what do you mean "the ball was loose"?

A. The shank of the ball as it comes through the bumper you could wobble it in the hole. It wasn't tight down to the bumper.

Q. So when you grabbed the ball, you could actually wobble it in the hole?

A. Yes, I could.

Q. Is that a proper attachment of a ball to a bumper?

A. No, sir.

Another State's expert (Stubblefield) testified that a loose and wobbly ball presents a dangerous situation.

Q. [PROSECUTION]: Back on the witness stand. And, Mr. Stubblefield, assume with me for a minute that the ball that this bumper—that was in the bumper that this hitch was attached to, assume with me for a minute you could take your hands and wobble it in the hole, could you tell the jury in your opinion whether that is a safe situation or if it is a dangerous situation to have a ball that wobbles like that?

<hr>

was legally and factually sufficient to support the verdict." This Court does not review the factual sufficiency of the evidence to support a verdict, and appellant does not claim that the Court of Appeals incorrectly applied the factual sufficiency standard. See Johnson v. State, 23 S.W.3d 1, 3 (Tex.Cr.App.2000). We, therefore, dismiss this portion of appellant's ground for review and address only the legal

sufficiency claim. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (legal sufficiency review requires appellate court to view the evidence in light most favorable to verdict and determine whether any rational factfinder could find elements of offense beyond a reasonable doubt).

2. See TEX. TRANSP. CODE, § 545.410.

A. [STUBBLEFLELD]: That, sir, would be a dangerous situation.

The State presented other evidence that the trailer hitch (which was supposed to lock in place to the ball on the bumper) also did not work properly. Long testified that the hitch was bent from having been hammered or hit a number of times. Long also testified that the hitch would not lock in place to the ball on the bumper. Long testified that this could cause the trailer to come loose.

Q. [PROSECUTION]: Why is that?

A. [LONG]: This portion of the hitch here, the front is bent.

Q. How do you bend a front portion like that?

A. Lots of ways, hammering on it, banging and bending. This end here is also bent.

Q. Let's take a look now. What areas are bent?

A. The front portion here at the front—which is straight on this one—it's a little bit different. This one has a little bit larger piece up here. This one is a little bit smaller.

Q. Hold that sideways if you can hold it—

A. (Witness complies) You can see up here at the front where it's bent forward.

Q. What other area is bent?

A. The finger portion where you grab to unlatch it back here are bent.

Q. Bent all the way down?

A. Yes, sir.

Q. So in the new hitch we have, [ ³]it sticks straight out?

A. Yes, sir.

Q. How is it on that one?

A. It's bent down around the back end here. Also the two tabs that are supposed to go in these slots, they're also bent up flat. They don't line up with the holes. They're up here on top of the round portion of the coupling.

Q. So is there anyway [sic] for the trailer hitch that [appellant] was operating, is there anyway [sic] for that hitch to lock in place?

A. None that I could see.

Q. And so if it can't lock in place, can it come loose?

A. Yes, it can.

Sylvester also testified that the hitch was bent from having been "hammered or hit on over time."

Q. [PROSECUTION]: What was the condition of that trailer hitch at that time?

A. [SYLVESTER]: You could tell—you could tell it was old. The top handle part of it, you could tell it had been bent over. It had been hammered or hit on over time. It was bent down. You could see what is remaining of the wire, the light wires wrapped around the front of the hitch here. I looked under the underside of the hitch. I didn't see any obvious damage at that time.

Stubblefield concluded that the hitch had been hammered a number of times in an attempt to get it to latch properly. He found that the hitch could not lock down on the ball. He testified that these concerns were "obvious."

Q. [PROSECUTION]: We may have to do this two or three times so everybody on the jury can see what it is. Would you start—when you looked at

**3.** The record reflects that Long was using a demonstrative hitch to show how a properly functioning hitch operated.

this thing, what were your concerns? What is your first concern?

A. [STUBBLEFIELD]: My first concern is—Well, there's obvious ones to me. The safety latches, the little pieces here are bent down that when you set this over the ball, this goes down, these safety catches go in here. Those are bent and are not in their safety spot.

Q. Can it lock down?

A. No, sir.

Q. Can you tell from looking at that hitch whether or not that's a brand-new problem or has that been there awhile?

[DEFENSE]: Objection. Calls for speculation.

[PROSECUTION]: This is opinion by an expert who has worked on used hitches.

[DEFENSE]: He hasn't been qualified as an expert yet.

[PROSECUTION]: I believe he has, your Honor.

[THE COURT]: I believe he has, too. The objection is overruled.

A. (Witness continuing) It appears that this has been tapped down to get the hitch to latch properly before—for whatever reason because—I mean, you shouldn't have to—normally you do not have to hit a coupler like this to get it to latch.

Stubblefield opined that the hitch was faulty.

Q. [PROSECUTION]: You're familiar with trailers and how they work, how they're supposed to be loaded and things of that nature?

A. [STUBBLEFIELD]: Yes, sir.

Q. That's part of your business that you do every day of the week?

A. Yes, sir.

Q. Did you have a chance to look, Mr. Stubblefield, at State's Exhibit 29?

A. Yes, sir.

Q. Did you do that last week, take a look at it? See what was wrong with it, what was right with it?

A. Yes, sir.

Q. Mr. Stubblefield, based on your experience and all your work, do you have an opinion about that hitch?

A. Yes, sir, I do.

Q. Would you tell the jury how you feel about that hitch?

A. Sure. I think that hitch is worn. It has been—appeared to be faulty and I personally wouldn't have pulled a trailer with that hitch on it. It's got some worn pieces. Some hammered pieces. Maybe because it wouldn't latch, maybe wouldn't fit the ball properly, so somebody had to tap it down or hit it with a hammer to get that to latch.

He also testified he would not want his family on the road with such a hitch.

Q. Would you want your family on the road with a hitch pulling a trailer like that one?

A. I would not.

Q. Why is that?

A. Because that would be a faulty hitch. There could be a problem with that.

Stubblefield also testified that there were "a variety of things with the different safety catches and mechanisms that could have went wrong" with the hitch and that the hitch should have been replaced before the incident that caused the victim's death.

The evidence also shows that appellant improperly loaded the dirt over the right rear axle of the trailer. Stubblefield explained that the proper way to load a trailer is to put the load up front because a load toward the rear of the trailer could cause the tongue of the trailer to come up.

Q. [PROSECUTION]: How are you supposed to load a trailer when you add weight to a trailer?

A. [STUBBLEFIELD]:You need 25 to 30 percent at least of your weight going to the front of the trailer to keep the trailer weight proportionate so you don't have more weight towards the back of your trailer to where the tongue of the trailer will try to come up.

Q. So if you load to the middle or to the back, it will cause the tongue of the—

[DEFENSE]: Objection. Leading.

[THE COURT]: Sustained.

Q. Would it cause the tongue of the trailer to come up?

A. Yes, sir. You need to have the [sic] more weight definitely to the front.

Q. That's standard?

A. Yes, sir.

\* \* \*

Q. And what if it's loaded right over the axle?

A. Right over the axle that would tend to make your pickup truck, also, light on the back end.

Q. Okay. So the recommendation is to load it to the front?

A. Definitely to the front.

Stubblefield also testified that "just a bump" could have caused the trailer to unhitch "with the safety features being modified."

Q. [PROSECUTION]: Okay. And now going back to what went wrong with this hitch on October 16th, were there a number of things that could have gone wrong?

A. [STUBBLEFIELD]: Yes, sir, I believe so.

Q. Would you share those with the jury?

A. Sure. I believe—

[DEFENSE]: Because of the nature of the question, I'm going to object to speculation, "could have gone wrong."

[THE COURT]: Objection overruled.

A. (Witness continuing) Well, I think admittedly I am not the full weight of the trailer, but a bump could have hit with the—and it pulled this thing and with the safety catches gone, that would keep this piece from coming backing and up, it could have jumped off.

Q. So in your opinion just a bump could have knocked this back and loosened up the whole catching mechanism?

A. Yes, sir. It could have actually been sitting on top of the ball. It could have hit—I don't know anything about the trailer—it could have hit a jolt, say, the road, maybe a bump in the road and come unlatched and then popped off the ball. But with the—the safety features being modified, I guess you would call it, that's what could have happened.

Portions of appellant's testimony from a civil deposition were introduced into evidence. *See Tello,* 138 S.W.3d at 491. Appellant admitted that he was the only person to use the trailer. He testified that he had "never had a problem" with the hitch or the trailer before, and that he did not know that the law required him to have safety chains. It did not occur to appellant that loading the dirt over the right rear axle of the trailer was unsafe. He had never had the trailer inspected. The day after the accident appellant had the ball and the trailer hitch replaced and he added safety chains.

During closing jury arguments, appellant argued that the trailer had "never popped off before." Appellant conceded that he was negligent but claimed that his negligence did not rise to the level of criminal negligence. The prosecution es-

sentially argued that an "ordinary person" with knowledge of an unsafe trailer hitch would have replaced the hitch.

When we started this case, we talked about what criminal negligence is. When is it that society steps in? We looked at what would an ordinary person do under all those circumstances? Do you recall? And the question is: Is this a gross deviation from the standard of care that an ordinary person would exercise under all those circumstances?

And that's all this trial has been about is: What were the circumstances facing [appellant]? And the question you have to ask yourself is: What would an ordinary person do under those circumstances? And I've listed those for you.

These are circumstances that we submit are important in this case. Number one, there is a loose ball. The ball doesn't properly fit on the trailer. We know that causes more tension, more likely to be a dangerous connection.

Number two, the hitch has been altered. Now this is important. This is not a hitch that is worn out. This is a hitch that because it's been turned too abruptly has caused it to crink causing the mechanism to tighten up and then, rather than fixing it, rather than spending the $28 for the hitch and 40–or $50 to get it fixed, rather than fix it, you get out a hammer and start beating on it. And you beat on it enough that you beat this forward so you no longer have a locking mechanism.

You have problems underneath. So you pinch that together so you have an unsafe hitch. These are the circumstances he's aware of: That he's got a mechanism that doesn't lock and it's dangerous—as well as a ball. You've got an unsafe hitch. And it's going to cost you as much as $150 to get all this fixed. So what does an ordinary person do? What would you do in that situation? What would you do in that situation if your job meant that every day you drive through the neighborhoods of our community where there are schools, where there are parks, where there are people walking up and down the streets? What would an ordinary person do?

That's really pretty self-explanatory, isn't it? So we have a loose ball. We have an altered hitch. What about a backup, then? The $15 for the chain, the 20–or $30 to back it up so if something happens, you tear up the back of your bumper. You don't rip apart a family.

Appellant claimed on direct appeal that the evidence is legally and factually insufficient to support his criminally negligent homicide conviction. In rejecting this claim, the Court of Appeals relied in part on civil cases applying ordinary civil negligence principles after noting that it was unable "to find another opinion of a Texas court addressing the sufficiency of evidence to support a conviction of criminally negligent homicide arising out of a trailer coming unhitched from a truck while being towed." *See Tello,* 138 S.W.3d at 493.[4] The Court of Appeals decided:

**4.** We do not read the Court of Appeals' opinion to decide that a finding of ordinary civil negligence will support a criminally negligent homicide conviction. We do note that the lawyer who filed a civil lawsuit on behalf of the victim's family testified at appellant's criminal trial that the civil negligence case against appellant was "rock solid" and did not "take much thought or activity." This lawyer explained the definition of "civil negligence."

> Q. [DEFENSE]: Okay. Can you tell us what civil negligence is?
> A. Civil negligence is defined in the Texas pattern jury charge and in case law as failing to do that which a reasonable and ordinary person would do under the same

In summary, there is evidence in the record that appellant caused [the victim's death], that he ought to have been aware that there was a substantial and unjustifiable risk of death from his failure to properly secure the trailer, and that his failure to perceive that risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. We conclude the jury could have found the essential elements of the offense of criminally negligent homicide beyond a reasonable doubt.

*See Tello*, 138 S.W.3d at 494.

This Court has found no Texas case law on point. The parties cite no cases like this, and our independent research of other jurisdictions has not revealed any similar cases. It is, however, unnecessary for us to find a similar case to decide that the evidence in this case is sufficient to support appellant's criminally negligent homicide conviction.

■ Under our case law, the State was required to prove that appellant's failure to perceive a substantial risk of death from his conduct grossly deviated from an ordi-

nary standard of care.[5] In this case, a jury could rationally find that appellant knew that the hitch on his trailer was faulty. For example, the evidence that the trailer hitch had been hammered a number of times in an attempt to get it to latch properly and Stubblefield's testimony that the hitch's defects were "obvious" support such a finding.

A jury could also rationally find that appellant should have, but failed, to perceive a substantial and unjustifiable risk of death from his conduct of knowingly using a faulty trailer hitch without safety chains on a public road.[6] A jury could also rationally find that appellant's failure to perceive this substantial and unjustifiable risk of death was clearly a gross deviation from the standard of care that an ordinary person would exercise under the circumstances.[7] These findings are sufficient to meet the definition of "criminal negligence" in Section 6.03(d).[8]

We understand appellant to claim that the evidence is insufficient to support a finding of criminal negligence because the evidence shows that he had "never had a problem with the trailer becoming unhooked."[9] Appellant argues in his brief:

---

or similar circumstances or doing that which a reasonable and prudent person would not do under the same or similar circumstances. That's generally what is quoted in the pattern jury charge.

5. *See Graham v. State*, 657 S.W.2d 99, 101 (Tex.Cr.App.1983) (in short, criminal negligence is "failure to perceive" risk of death from actor's conduct which must rise to level of "gross deviation" from an ordinary standard of care).

6. A jury could also rationally find that appellant's conduct of knowingly using a faulty trailer hitch without safety chains on a public road grossly deviated from the standard of care that an ordinary person in the construction business would exercise because this conduct created a substantial and unjustifiable risk of death. The prosecution twice empha-

sized during closing jury arguments that appellant was in the business of pulling trailers.

7. *See Graham*, 657 S.W.2d at 101 (defendant driver's failure to perceive risk of death from his conduct of speeding, racing and ignoring red light was clearly a gross deviation from ordinary standard of care).

8. We agree with the State's claim that it proved "[a]ppellant ought to have been aware of a substantial and unjustifiable risk of death where he pulled [an] improperly loaded trailer using a faulty hitch, attached to a ball that was not tight down to the bumper, and with no safety chains."

9. Appellant cites several cases which he claims support this claim. *See Still v. State*, 709 S.W.2d 658, 660–61 (Tex.Cr.App.1986) (defendant, charged with murdering his wife,

In all the preceding cases there was evidence that the defendant should have known of the fatal risk involved because there had been an occurrence prior to the fatal incident that put the defendant on notice of problems he should have been able to perceive. In the case at bar, the evidence was to the contrary. The appellant had never had a problem with the trailer becoming unhooked. The Fourteenth court affirmed the conviction not based on the perception of the Appellant or what the Appellant should have perceived as required to convict based on the criminally negligent standard, but rather based it on the perception of the state witnesses who failed to establish that appellant's actions were a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actors [sic] standpoint. [Case citations omitted] did apply the standard correctly in light of the evidence of the perception or what should have been perceived by each defendant due to the facts of each particular case. In the case at bar the State did not prove that the Appellant should have perceived the hitch would unhook and incorrectly viewed the evidence

from the standpoint of the states [sic] witnesses and not that of Appellant.[10]

The State was not required to prove that appellant "had a problem with the trailer becoming unhooked" or that the trailer had "popped off before."[11] The State's evidence supports a finding that appellant knew that the trailer hitch was faulty, putting him "on notice of problems he should have been able to perceive." Imposing criminal liability on appellant on this basis and on the other circumstances presented in this case does not conflict with the cases cited in appellant's brief. The evidence supports a finding that appellant had notice of a condition creating a substantial risk of death which appellant should have perceived.

Finally, we cite the New York Court of Appeals' decision in *People v. Boutin*, 75 N.Y.2d 692, 556 N.Y.S.2d 1, 555 N.E.2d 253 (1990), to illustrate when there is insufficient evidence to support a finding of criminal negligence. *Boutin*, 556 N.Y.S.2d 1, 555 N.E.2d at 254, described its criminal negligence standard as follows:

> Our decisions construing these provisions have emphasized that criminal liability cannot be predicated on every act

---

not entitled to criminally negligent homicide instruction because evidence showed that defendant was aware of risk of gun discharging while he tried to uncock it based in part on this having happened before); *Hookie v. State*, 136 S.W.3d 671, 676 (Tex.App.-Texarkana 2004, no pet.) (defendant was aware of maladjusted brakes on his truck); *Stadt v. State*, 120 S.W.3d 428, 433–34 (Tex.App.-Houston [14th Dist] 2003, pet. granted) (defendant was aware of dangers of overpass where accident occurred).

**10.** The State claims in its brief that this amounts to a claim that it was required to prove "recklessness" instead of "criminal negligence." The State argues:

> However, requiring the State to prove that Appellant was already "on notice" of the

risk of the trailer becoming detached prior to the date of the offense is the same as proving that [appellant] was aware of the risk but consciously disregarded it. Basically, Appellant would require proof of "reckless" [Footnote setting out statutory definition of "reckless" omitted] conduct, as opposed to "criminal negligence." "However, the fact that he had not experienced difficulty with the trailer on prior occasions is not probative of whether he ought to have been aware of the substantial risk of death cause [sic] by his failure to properly secure his trailer on the date of the accident in question." *Tello v. State*, 138 S.W.3d at 494.

**11.** The evidence arguably supports a finding that the trailer had "popped off before."

of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong [citations omitted]. What, we believe, is abundantly clear from our decisions and from the governing statutory language is that criminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been "substantial and unjustifiable", and the failure to perceive that risk must have been a "gross deviation" from reasonable care.

Applying this standard, the Court in *Boutin* decided that a driver's unexplained failure to see a parked car until he collided with it and killed two people did not by itself support a conviction for criminally negligent homicide. *See Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 253, 256 (evidence established only that "defendant inexplicably failed to see the vehicle until he was so close that he could not prevent the collision. Though it resulted in two tragic deaths, that unexplained failure, without more, does not constitute criminally negligent homicide"). This case involves much more than an unexplained failure of a trailer hitch that caused a death. This case

also involves "some serious blameworthiness in the conduct that caused it." *See Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 254.

The judgment of the Court of Appeals is affirmed.

COCHRAN, J., filed a concurring opinion.

COCHRAN, J., concurring.

I join the majority opinion. I write separately only to emphasize the fine, but marked, legal line between civil negligence and criminal negligence.

Civil or "simple" negligence "means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances."[1] And "ordinary care" means "that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances."[2]

Criminal negligence, however, requires a significantly greater degree of deviation from this standard of ordinary care before a person may be held criminally liable. It must be a "gross" or extreme deviation from that standard. And it is measured solely by the degree of negligence, not any element of actual awareness.[3] Conduct

---

1. *Keetch v. Kroger Co.,* 845 S.W.2d 262, 271 (Tex.1992) (Mauzy, J., dissenting) (quoting TEXAS PATTERN JURY CHARGE 65.01).

2. *Id.*

3. For example, if a grocery store sells unbagged grapes, one of them falls to the floor, and a shopper then slips on that grape and falls to the floor, the grocery store might be held civilly negligent for failing to be aware of the risk that its fallen grapes could cause a

shopper to slip and break a leg. It might be criminally negligent for that same grocery store to permit shoppers to enter into the meat-cutting department knowing that the floor is covered with blood and meat detritus and that the butchers are using unprotected automated meat saws, if a shopper slips and falls into a band saw and is killed by its teeth. In both instances the manager may be subjectively unaware of the risk of harm that fallen grapes and unprotected meat saws may create, but he is aware of the circumstances (e.g.,

that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility, than does simple negligence. A person may be found criminally negligent when he inadvertently creates a substantial and unjustifiable risk of which he ought to be (but is not) aware.[4] And a jury must evaluate the defendant's failure of perception and determine whether, under all the circumstances, it was serious enough to be condemned under the criminal law.[5]

Of course, as the risk of harm increases, so does the likelihood that the person will actually be aware of the risk created by his or her conduct. Despite this increased likelihood of awareness, criminal negligence does not require proof of the accused's subjective awareness of the risk of harm. A person's prior "problems" with a car, truck, or trailer hitch may be considered by the jury in determining whether a defendant's conduct is a gross deviation from the standard of care that an ordinary person would exercise, but evidence of such prior "problems" are neither necessary or sufficient by themselves to establish criminal negligence. It is a defendant's awareness of the attendant circumstances, not his subjective awareness of the risk of harm, that matters in criminal negligence. Thus, if an ordinary person in appellant's position would check to ensure that a trailer was properly se-

cured to his truck with safety chains; that the ball on the bumper to which the trailer hitch was attached was secure and properly attached; that the trailer hitch itself locked properly onto the ball; and that a load of dirt was properly loaded toward the front of the trailer rather than over the rear axle, then appellant's failure to check these items for the ordinary safe hauling of dirt may suffice to establish a gross deviation from the ordinary standard of care.[6] This is true even though appellant himself was subjectively unaware of the great risk of harm or death caused by his failure to perform such safety measures. Criminal liability is imposed because he should have been aware of the substantial risk of death that his failure to both note and repair these numerous deficiencies entailed.[7] Had there been only a single deviation from the ordinary standard of care, e.g., had appellant exercised ordinary care but for the failure to attach a safety chain between the trailer and truck, then his conduct in "failing to properly secure a trailer to his truck" might constitute mere simple civil negligence, not criminal negligence.

With these comments, I join the majority.

---

the grapes on the floor and the slippery blood underneath an automated band saw), and he should have been aware of the moderate risk of harm in the first case and the substantial and unjustifiable risk of death or serious bodily injury in the second.

4. *See* MODEL PENAL CODE § 2.02 commentary at 240 (1985).

5. *Id.* at 241.

6. *See id.* at 243:

When people have knowledge that conviction and sentence, not to speak of punish-

ment, may follow conduct that inadvertently creates improper risk, they are supplied with an additional motive to take care before acting, to use their faculties and draw on their experience in gauging the potentialities of contemplated conduct. To some extent, at least, this motive may promote awareness and thus be effective as a measure of control.

7. In this case, the prosecutor fully and accurately set out appellant's numerous deficient acts in his closing statement, and he discussed the appropriate standard of care. *See* Court's op. at pp. 154–55.