Robert Alan QUEEMAN, Appellant

v.

The STATE of Texas, Appellee

No. 04–15–00015–CR

Court of Appeals of Texas, San Antonio.

Delivered and Filed: January 27, 2016

James Gerard McDermott, Austin, TX, for Appellant.

Fred Hernandez, District Attorney, for Appellee.

Sitting: Sandee Bryan Marion, Chief Justice, Rebeca C. Martinez, Justice, Jason Pulliam, Justice

## OPINION

Opinion by: Sandee Bryan Marion, Chief Justice

The sole issue presented in this appeal by appellant Robert Alan Queeman is whether the evidence is legally sufficient to support his conviction of criminally negligent homicide. Holding the evidence is legally insufficient to support the conviction, we reverse the trial court's judgment and render a judgment of acquittal.

### BACKGROUND

Maria del Rosario Luna was driving eastbound on a two-lane highway when Queeman's van struck her from behind as she was attempting to turn left on an intersecting street. The impact caused Luna's SUV to flip over several times. Luna's SUV flipped over a truck being driven westbound on the highway before the SUV came to rest upside down. The passenger in the back seat of Luna's SUV died as a result of the injuries she sustained.

Queeman was indicted for manslaughter and criminally negligent homicide. A jury acquitted Queeman of manslaughter but found him guilty of criminally negligent homicide. The trial court assessed Queeman's sentence at eighteen months in a state jail facility. Queeman appeals.

### STANDARD OF REVIEW

In evaluating the legal sufficiency of the evidence, we consider the evi-

dence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of all of the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Merritt v. State,* 368 S.W.3d 516, 525 (Tex.Crim.App.2012). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Montgomery v. State,* 369 S.W.3d 188, 192 (Tex.Crim.App.2012); *Merritt,* 368 S.W.3d at 525. A jury is permitted to draw multiple reasonable inferences from the facts so long as the inferences are supported by the evidence presented at trial. *Merritt,* 368 S.W.3d at 525. A jury may not, however, reach a conclusion based on a factually unsupported inference. *Hooper v. State,* 214 S.W.3d 9, 15 (Tex.Crim.App.2007). A jury is also not permitted to reach a conclusion based on speculation. *Merritt,* 368 S.W.3d at 525; *Hooper,* 214 S.W.3d at 15. "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper,* 214 S.W.3d at 16. "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.*

### CRIMINALLY NEGLIGENT HOMICIDE

The Texas Court of Criminal Appeals has explained the State's burden in proving criminally negligent homicide beyond a reasonable doubt as follows:

> To make a legally sufficient showing of criminally negligent homicide, the state must prove that (1) appellant's conduct caused the death of an individual; (2) appellant ought to have been aware that there was a substantial and unjustifiable risk of death from her conduct;

and (3) appellant's failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. The circumstances are viewed from the standpoint of the actor at the time that the allegedly negligent act occurred. Criminal negligence does not require proof of appellant's subjective awareness of the risk of harm, but rather appellant's awareness of the attendant circumstances leading to such a risk. The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all.

> Conduct that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility, than does simple negligence. The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong. The risk must be "substantial and unjustifiable," the failure to perceive it must be a "gross deviation" from reasonable care as judged by general societal standards. With criminal negligence, the defendant ought to have been aware of a substantial and unjustifiable risk that his conduct could result in the type of harm that did occur, and that this risk was of such a nature that the failure to perceive it was a gross deviation from the reasonable standard of care exercised by ordinary people. The degree of deviation from reasonable care is measured solely by the degree of negligence, not any element of actual awareness. In finding a defendant criminally negligent, a jury is determining that the defendant's failure to perceive the associated risk is so

great as to be worthy of a criminal punishment.

*Montgomery,* 369 S.W.3d at 192–93 (internal citations omitted).

In *Montgomery,* the court held the State satisfied its burden of proof, noting the appellant: (1) was talking on her cell phone while driving her SUV in the middle lane of a three-lane access road adjacent to a highway; (2) made an abrupt, unsafe or aggressive lane change into the left lane without braking, signaling, or looking for other approaching vehicles; (3) in order to enter the highway via an entrance ramp she had already passed by 92 feet; (4) even though the beginning of the solid-white-lined area between the ramp and the access road known as the "safety barrier" was behind her; and (5) caused a three-car collision in which the passenger in one of the vehicles died. 369 S.W.3d at 191, 193–95. In setting forth the burden of proof for criminally negligent homicide, the court relied extensively on one of its prior opinions. *See Montgomery,* 369 S.W.3d at 192–93 (citing both the majority and concurring opinions in *Tello v. State,* 180 S.W.3d 150, 156 (Tex.Crim.App.2005)).

In *Tello,* a "trailer unhitched from appellant's truck, and struck and killed a pedestrian." 180 S.W.3d at 150. Evidence at trial established: (1) the ball on the bumper of the truck to which the trailer hitch was attached was loose and wobbled; (2) the trailer hitch was bent from having been hammered or hit a number of times and would not lock in place on the ball on the bumper; (3) appellant admitted he was the only person to use the trailer; (4) no safety chains secured the trailer to the truck as required by state law; (5) appellant improperly loaded dirt over the right rear axle of the trailer which could cause the tongue of the trailer to come up; and (6) "just a bump" could have caused the trailer to unhitch. After reviewing the evidence, the court concluded, "a jury could rationally find that appellant knew that the hitch on his trailer was faulty." *Id.* at 156. In addition, the court concluded, "[a] jury could also rationally find that appellant should have, but failed, to perceive a substantial and unjustifiable risk of death from his conduct of knowingly using a faulty trailer hitch without safety chains on a public road." *Id.* Finally, the court concluded, "[a] jury could also rationally find that appellant's failure to perceive this substantial and unjustifiable risk of death was clearly a gross deviation from the standard of care that an ordinary person would exercise under the circumstances." *Id.* The court held, "These findings are sufficient to meet the definition of 'criminal negligence.'" *Id.*

Although the court held the evidence sufficient in *Tello,* the court also cited the New York Court of Appeals' decision in *People v. Boutin,* 75 N.Y.2d 692, 556 N.Y.S.2d 1, 555 N.E.2d 253 (1990), "to illustrate when there is insufficient evidence to support a finding of criminal negligence." *Tello v. State,* 180 S.W.3d at 157–58 (citing *Boutin*). The court quoted *Boutin's* description of the criminal negligence standard as follows:

> Our decisions construing these provisions have emphasized that criminal liability cannot be predicated on every act of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong [citations omitted]. What, we believe, is abundantly clear from our decisions and from the governing statutory language is that criminally negligent homicide requires not only a failure to perceive a

risk of death, ***but also some serious blameworthiness in the conduct that caused it.*** The risk involved must have been "substantial and unjustifiable", and the failure to perceive that risk must have been a "gross deviation" from reasonable care.

180 S.W.3d at 157–58(quoting *Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 254) (emphasis added). The court then noted the New York court applied the standard in *Boutin* and "decided that a driver's unexplained failure to see a parked car until he collided with it and killed two people did not by itself support a conviction for criminally negligent homicide." *Id.* at 158. The court then distinguished *Boutin,* noting the *Tello* case involved "much more than an unexplained failure of a trailer hitch that caused a death." *Id.* Instead, *Tello* involved " 'some serious blameworthiness in the conduct that caused it.' " *Id.* (quoting *Boutin,* 556 N.Y.S.2d 1, 555 N.E.2d at 254).

In *Boutin,* the defendant was driving a truck southbound in the right-hand lane of a highway. 556 N.Y.S.2d 1, 555 N.E.2d at 253. "The night was overcast and dark, the weather was rainy with fog, and the pavement was slushy and wet." *Id.* "[A] marked police car, with emergency lights flashing, was stopped with all four tires in the right-hand lane behind a disabled tractor trailer." *Id.* The defendant's truck hit the police car, and the state trooper and the driver of the disabled vehicle, who were both seated inside the police car, were killed. *Id.,* 556 N.Y.S.2d 1, 555 N.E.2d at 253–54. The defendant and his passenger both stated they had not seen the flashing lights. *Id.,* 556 N.Y.S.2d 1, 555 N.E.2d at 254. Other witnesses who had driven by earlier testified they saw the police car or its lights, although some mistakenly perceived the police car to be on the shoulder of the road. *Id.* An expert opined the defendant had not applied his

brakes and was traveling between 60 and 65 miles per hour. *Id.* Before the grand jury, however, the expert estimated the defendant's speed to be between 50 and 60 miles per hour, and the defendant's passenger testified at trial that the speedometer reading was between 40 and 50 miles per hour just before the accident. *Id.* The passenger also testified the defendant was looking ahead while carrying on a conversation and stepped on the brakes approximately 200 feet before impact. *Id.*

In addition to announcing the criminal negligence standard quoted above, the New York court further explained "unless a defendant has engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of death, he has not committed the crime of criminally negligent homicide; his 'nonperception' of a risk, even if death results, is not enough." *Id.,* 556 N.Y.S.2d 1, 555 N.E.2d at 255. The New York court then distinguished several prior cases in which the evidence was held to be sufficient when the facts established: (1) the defendant had failed to obey a red traffic signal and was traveling at an unlawfully high rate of speed; (2) the defendant had been driving at an excessive rate of speed on a moderately traveled city street while engaged in a drag race; (3) the defendant was traveling between 70 to 90 miles per hour on a busy city road racing side-by-side with another vehicle; and (4) the defendant drove at least 90 miles per hour in a 55 mile per hour zone and, after being warned by his passenger to show down, accelerated past a line of cars which the police had stopped and ultimately struck a state trooper. *Id.* Distinguishing these other cases, the New York court held:

.... As contrasted with [the other cases], the evidence does not show that defendant was engaged in any criminally culpable risk-creating conduct—e.g.,

dangerous speeding, racing, failure to obey traffic signals, or any other misconduct that created or contributed to a 'substantial and unjustifiable' risk of death. Rather, it establishes only that defendant inexplicably failed to see the vehicle until he was so close that he could not prevent the collision.

*Id.*, 556 N.Y.S.2d 1, 555 N.E.2d at 255–56.

### EVIDENCE PRESENTED AT TRIAL

With this understanding of the State's burden of proof, we consider the relevant evidence presented at trial. As previously noted, Luna was driving eastbound on a two-lane highway when Queeman's van struck her from behind as she was attempting to turn left on an intersecting street. The posted speed limit was 40 mph.

Luna, who had been hospitalized overnight for the injuries she sustained in the accident and had ongoing memory problems as a result, could not recall any details regarding the collision. Although she provided a statement to the investigating officer five days after the accident, Luna did not remember the statement. Luna did not recall telling the investigating officer that she did not activate her left turn signal. Luna also did not recall receiving a traffic citation for failing to use her turn signal. Luna had no recollection of whether she was stopped or moving at the time of the impact.

Pedro G. Nieto, who was driving the truck Luna's SUV flipped over, testified he observed vehicles traveling eastbound in the other lane, but he did not see the exact moment of impact. Nieto knew an impact had occurred because he saw Luna's SUV "flipping like a toy down the street" before it flipped over his truck. Nieto only re-

called seeing the SUV and a large white van traveling behind the SUV.

Tully Welch was a highway patrol trooper with the Texas Department of Public Safety and led the investigation of the accident. Trooper Welch testified DPS has six levels of accident investigation certification, and he had only completed the second level. With regard to the conclusions he reached as a result of his investigation, Trooper Welch testified:

.... [Mrs. Luna] was going to make a left-hand turn on to Gove Street off of Highway 90, and she freely admitted to me that she didn't use her turn signal. I believe she wrote that in her statement. She said she slowed down in preparation to make this left-hand turn. You know, I think basically the investigation revealed, and statements corroborated that Mr. Queeman and his co-worker[1] were traveling behind Ms. Luna, also traveling east on Highway 90. Mr. Queeman stated, I think, in his statement that she—that Mrs. Luna suddenly slowed down and was going to make a left-hand turn and he couldn't avoid hitting her, basically, and in the damage to the vehicles, his vehicle and her vehicle—I mean, it is evident that the right rear of the [SUV] was struck by the left front of Mr. Queeman's. You know, what was happening at that time or what was going through his mind or what he was doing, I don't know. The fact of the matter is that he rear-ended her essentially. It was a rear-end collision. She was either—and it is not known a hundred percent whether she was at a dead stop or she was actually moving slightly forward. If she was moving slightly forward it was very, very slow. She was almost at a dead stop, if she wasn't at a dead stop waiting to make a left-hand turn. Now, the fact

---

1. The co-worker told Trooper Welch he was asleep and did not see anything.

is that she was rear-ended by Mr. Queeman.

Trooper Welch testified the filament in the bulbs in the brake lights of Luna's SUV established that her brake lights were on at the time of the impact. Trooper Welch also testified a skid mark in the street was from Luna's SUV and was evidence that Luna was stopped or nearly stopped. Trooper Welch further testified the absence of any skid marks from Queeman's van indicated Queeman "didn't have time or didn't brake" or that "there was very minimal braking at the time on his part." Based on the "yaw marks"[2] in the street from Queeman's van, Trooper Welch applied a mathematical formula and calculated Queeman's speed was 34 mph after the collision. In applying the formula, Trooper Welch used a "coefficient of friction" of 70 percent. Trooper Welch admitted that he had to estimate the "coefficient of friction" in order to make the calculation because he did not have the training necessary to measure the actual coefficient of friction.[3] Trooper Welch explained that the actual coefficient of friction could vary the calculation of Queeman's post-collision speed. For example, using a "coefficient of friction" of 80 percent, Queeman's post-collision speed would be calculated at 37

mph, while using a "coefficient of friction" of 60 percent would result in a post-collision speed of 32 mph. Trooper Welch testified Queeman reported he was traveling approximately 36 or 37 mph before the accident; however, Trooper Welch personally believed Queeman's speed was "significantly more" than 36 or 37 miles per hour because the impact of the collision would have caused him to lose more momentum than 2 or 3 mph. In response to whether it was "safe to say that [Queeman] was exceeding 40 miles an hour," Trooper Welch responded, "Yes, sir."

On cross-examination, Trooper Welch stated he issued a traffic citation to Queeman for failing to control his speed and a traffic citation to Luna for failing to use her turn signal.[4] Trooper Welch stated he did not examine the brake light bulbs in Queeman's van to determine if he had braked prior to the impact. Trooper Welch admitted he did not have the training to measure Queeman's speed before the collision because the calculation involved "highly complex mathematical formulas." Trooper Welch further admitted he did not know Queeman's pre-accident speed, stating, "I don't have any way of knowing that."

2. Ranger Jose M. Sanchez, who was a DPS trooper when the accident occurred and assisted Trooper Welch by taking the photographs at the accident scene, explained the term "yaw marks" as follows: "Usually a skid mark is a straight skid, where somebody applies their brakes, and then in an effort to try to stop immediately it will cause a straight skid, what we call—and it will leave a direct line where the tires are making contact with the asphalt obviously. The yaw marks are when those tires are trying to catch grip on the asphalt ... those tires will leave marks as it is trying to grip, and those are usually called the yaw marks."

3. Trooper Welch explained the coefficient of friction varies based on the weather and the type of surface, "whether it is grass, dirt,

caliche, asphalt, [or] concrete." Trooper Welch explained an instrument can be hooked up to a car to actually measure the coefficient of friction for a particular surface, but he was not trained to use that instrument. Trooper Welch stated, however, it was "pretty well accepted" that "dry asphalt is going to be somewhere in the range of 70 percent," but could "vary up, down, a little bit, depending on the quality of the asphalt, or the quality of the gravel that is in the asphalt."

4. Trooper Welch explained failure to control speed is different than speeding, stating a driver has a responsibility to control his speed, regardless of the speed limit, so the driver does not hit another vehicle. Trooper Welch did not ticket Queeman for speeding.

Luna's sister Josefa Payne was riding in the front passenger seat of Luna's SUV. At trial, Payne testified she did not remember Luna beginning to turn left or whether Luna activated her turn signal. Payne did believe Luna's SUV was at a stop at the time of the impact. Payne remembered hearing the collision.

## ANALYSIS

■ Although Trooper Welch did not believe Queeman's statement that he was traveling 36 or 37 mph, Trooper Welch admitted he did not know Queeman's rate of speed before the accident. Based on his calculations using an estimated "coefficient of friction," Trooper Welch testified he believed Queeman was traveling in excess of 40 mph. Although he believed Queeman's speed was "significantly more" than 36 or 37 mph, Trooper Welch could not quantify his estimation of how much in excess of 40 mph Queeman was traveling. In addition, Trooper Welch did not issue Queeman a traffic citation for speeding.

Based on the foregoing, the jury did not have any evidence from which it could reasonably infer that Queeman was traveling at an "excessive" rate of speed; therefore, any such inference would be impermissible speculation. *See Merritt*, 368 S.W.3d at 525; *Hooper*, 214 S.W.3d at 15–16. Although a conclusion that Queeman was excessively speeding "may not be completely unreasonable," "it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Hooper*, 214 S.W.3d at 16. The evidence did, however, establish that Queeman observed Luna's vehicle in time to swerve and hit the right passenger end of her vehicle.

Therefore, like the evidence in *Boutin*, the evidence presented in this case "does not show that [Queeman] was engaged in any criminally culpable risk-creating conduct—e.g., dangerous speeding, racing,

failure to obey traffic signals, or any other misconduct that created or contributed to a 'substantial and unjustifiable' risk of death." 556 N.Y.S.2d 1, 555 N.E.2d at 255–56. Similarly, the evidence does not show any other type of serious, blameworthy conduct like distracted driving due to cell phone use and an abrupt, aggressive, unsafe lane change as in *Montgomery* or drug or alcohol intoxication. Therefore, from the evidence presented, the jury could not find "some serious blameworthiness" in Queeman's conduct that caused a risk of death. *Id.*, 556 N.Y.S.2d 1, 555 N.E.2d at 254. Instead, the evidence "establishes only that [Queeman] inexplicably failed to see [Luna's] vehicle until he was so close that he could not prevent the collision." *Id.*, 556 N.Y.S.2d 1, 555 N.E.2d at 256. Accordingly, we hold the evidence is legally insufficient to support Queeman's conviction.

## CONCLUSION

Because the evidence is legally insufficient to support Queeman's conviction, the judgment of the trial court is reversed, and a judgment of acquittal is rendered.