Opinion issued February 18, 2010





 











     

In The
Court of Appeals
For The
First District of Texas




NO. 01-08-00785-CR




CLINTON MITCHELL, Appellant,

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 179th district Court
Harris County, Texas
Trial Court Cause No. 1176893




O P I N I O N
          A jury found appellant, Clinton Mitchell, guilty of criminally negligent
homicide.


 The jury also found, in a special issue, that appellant used a deadly
weapon, namely, a motor vehicle, during the commission of the offense. The trial
court assessed punishment at five years in prison.


 In two points of error, appellant
challenges the legal and factual sufficiency of the evidence to support his conviction.
          We affirm.
Background 
          It is undisputed that, while driving a dump truck for his employer, the City of
Houston, appellant ran over and killed the complainant, Adam Knetsar. As a result
of the incident, a grand jury indicted appellant for the offense of criminally negligent
homicide. The indictment alleged that appellant had caused Knetsar’s death by
criminal negligence. 
          At trial, the State presented eight witnesses, who were at the scene of the
incident. Chief among them was Chandra Kelly, appellant’s co-worker, who was in
the passenger seat of the dump truck at the time of the incident. 
          Kelly and appellant were laborers employed by the City of Houston. On the
morning of October 24, 2006, she and appellant had left one job site and were en
route to another in a city dump truck. To reach the job site, appellant and Kelly
traveled south down Atascocita Road toward Will Clayton Parkway. Where it
intersects Will Clayton Parkway, Atascocita Road has four lanes: two middle lanes
for traffic going straight, a left turn lane, and a right-turn lane. The route to the next
job site required appellant to drive straight through the intersection.
          Kelly testified that, as they were approaching the intersection, the dump truck
was in the “middle lane.” But as they drew closer, the dump truck veered into the
“right lane.” On questioning, Kelly stated that she was positive that, as they
approached the intersection, the light was red; she noted that “[a]ll the cars [were] at
a standstill.” Kelly testified that she knew they were about to have an accident
because she saw a stationery Jeep Cherokee in the right-turn-only lane and noticed
that appellant was accelerating. To avert the impact with the Jeep, Kelly testified that
she called appellant’s name three times, to no avail. Kelly closed her eyes
immediately before the dump truck struck the back of the Jeep. She kept her eyes
closed until the truck came to a stop across the street. She testified that she never
heard or felt appellant apply the brakes. 
          Other scene witnesses described how, after the impact with the dump truck, the
Jeep went “airborne,” with all four of its wheels leaving the pavement. The Jeep
struck a traffic light pole and then landed on its driver’s side.
          After striking the Jeep, the dump truck continued across the intersection toward
a group of workers who were installing new traffic signals. Adam Knetsar was
among the workers. The dump truck ran over Knetsar, killing him. The truck also
struck another worker, who sustained multiple fractures, including two broken legs. 
After striking the workers, the dump truck continued to roll through a ditch onto a
grassy area. It came to a stop at the edge of a Walgreen’s parking lot. 
          With respect to the details preceding the chain of events that resulted in
Knetsar’s death, the State offered other scene-witness testimony, which corroborated
Kelly’s account. A number of witnesses commented on the speed of appellant’s
dump truck as he approached the intersection. One witness noticed in her side mirror
that appellant was approaching from behind “very fast.” Another driver, who was
stopped at the light on Atascocita, saw appellant to his right driving past “at a
considerable rate of speed.” He believed appellant that was traveling 35 to 45 miles
per hour. Yet another witness, who was in a van stopped at the intersection, looked
in her rear view mirror and saw appellant approaching from behind in the right-turn-only lane. She observed that he was traveling at “a high rate of speed.” The witness
recalled that she knew that “something terrible was going to happen” because she had
seen a vehicle stopped in the right lane. She knew that appellant was going too fast
to either stop for the red light or to make the turn.
          In addition, one other witness testified that the Jeep was stopped in the right-turn-only lane before the impact. Two other witnesses, who were at a gas station at
the intersection, each unequivocally testified that the light for traffic on Atascocita
for southbound traffic was red. Other witnesses, who were in vehicles at the
intersection, confirmed that the southbound traffic on Atascocita was stopped at the
time of the impact. None of the witnesses, when questioned, heard appellant apply
his brakes at any point during the incident.
          Only one witness, who was driving behind appellant, testified that appellant’s
light was green. That witness also testified that appellant was not in the right-turn-only lane when he hit the Jeep. She could not tell where the Jeep was before
appellant hit it. The witness also stated that the dump truck was traveling less than
45 miles per hour. 
          The State also presented the expert testimony of two officers from the Harris
County Sheriff’s Department. Each officer has specialized training in accident
investigation. The first to testify, Sergeant S. Parker, arrived at the scene 45 minutes
following the incident. 
          Sergeant Parker told the jury that he had observed that the right-turn-only lane
on Atascocita had a very large gouge mark, indicating the spot of the collision. 
Sergeant Parker stated that the gouge mark had not weathered and appeared to be
freshly made. The sergeant also testified that he found no evidence of braking, such
as skid marks, at the scene. Sergeant Parker also observed that the tire marks on the
grassy area, over which the dump truck had traveled before coming to a stop,
indicated that the truck’s tires had been rolling, not skidding. Sergeant Parker further
explained that the truck had rolled through a ditch before stopping and stated that it
was natural forces, not braking, that had made the truck finally stop. 
          Sergeant Parker further testified that the greatest amount of damage to the Jeep
was at its rear, indicating that it was hit with the greatest force from behind. On
further questioning, Parker explained that damage to the front, left side of the Jeep
was caused when the Jeep struck the traffic light pole after being hit from behind.
          The State also presented the testimony of Deputy D. Pearson, who testified that
he has received advanced accident investigation training. Through the training,
Deputy Pearson has learned how to apply different formulas to determine the speed
at which a vehicle was traveling at the time of a collision. In this case, Deputy
Pearson explained to the jury that he had applied two different formulas to determine
the speed of appellant’s vehicle at the time of the impact with the Jeep. 
          Deputy Pearson told the jury that the Jeep had traveled 73 feet before it hit the
traffic light pole. Applying the “conservation momentum formula,” Deputy Pearson
testified that he calculated that the dump truck was traveling at a minimum speed of
37 miles per hour when it struck the back of the Jeep. But, Deputy Pearson also told
the jury that he did not think that this was “realistic” and did not reflect the “true
speed” of the dump truck. He believed that the truck had been traveling faster.
          Deputy Pearson also applied the “energy formula.” Using this, he calculated
that the dump truck had been traveling at a minimum of 45 to 50 miles per hour at the
time of the collision. 
          The evidence introduced through Deputy Pearson also showed that, at the time
the dump truck ran over Knetsar, it was traveling at 23 miles per hour. 
          In addition, Deputy Pearson told the jury that appellant held a commercial
driver’s license, which is required to drive a commercial dump truck. The deputy
explained that, to obtain a commercial driver’s license, a driver must undergo an
“extensive” application process and take a specialized driving test. The driver must
demonstrate a proficiency in driving the type of commercial vehicle that he will
ultimately drive on the road. A holder of a commercial driver’s license must also
attend a federally mandated safety education program. 
          The officer explained that these additional requirements are placed on
commercial drivers because of the “increased risks” that accompany driving a
commercial vehicle. One such risk is the additional weight of commercial vehicles
compared to passenger vehicles. As an example, Deputy Pearson noted that the
31,000 pound dump truck in this case weighed eight times that of the Jeep it hit. 
Deputy Pearson stated, “[W]e know when we have that much mass involved in a
crash, there is a potential for serious injury or death that increases.”
          Deputy Pearson also explained that a dump truck’s bumper is much higher than
that of a passenger vehicle. As a result, in a collision, the commercial vehicle’s
bumper will often penetrate the “softer portion” of the passenger vehicle, thereby
increasing the severity of the resulting injuries. Deputy Pearson pointed out that such
was the case here, as could be seen in the photographs of the Jeep. 
          Evidence introduced at trial showed that the dump truck had “air brakes.” 
Deputy Pearson explained that air brakes have a half-second delay to engage. He
continued, “[Y]ou have to take [sic] more attention to your driving because it’s going
to take longer for you to stop.” 
          Following the presentation of the State’s case, appellant testified in his own
defense. Appellant stated that, as he approached the intersection of Atascocita and
Will Clayton, he was driving in the right, center lane to go straight through the
intersection. He claimed that Kelly was napping in the passenger seat. Appellant
denied that he ever moved into the right-turn-only lane. He stated that he was going
35 to 37 miles per hour. 
          When asked what color his light was at the intersection, appellant was adamant
that his light was green. He stated that two cars in front of him had driven through
the intersection. Appellant also testified that the traffic on Will Clayton was stopped,
and he could see that the Will Clayton traffic had a red light.
          Appellant described how, as he proceeded through the intersection, he saw a
“covered truck coming towards my front end” on Will Clayton. On direct
examination, appellant testified that he hit his brakes and tried to miss the vehicle. 
According to appellant, the vehicle “caught [his] front end” and “skidded off me.” 
He stated that he then caught the vehicles back end. He testified that the collision
with the back end of the vehicle was the “second impact,” not the first. After hitting
the vehicle, he said that he “kept going” and that his dump truck went “airborne.” 
After he went airborne, appellant stated that he “landed over” Knetsar. 
          Appellant testified that he continued to apply his brakes, but explained that the
dump truck had air brakes, which are hard to engage. He claimed that, despite his
efforts, the air brakes would not “catch.” 
          On cross-examination, appellant provided more details about the collision. He
testified that he saw the Jeep coming from his left and that he veered to his right to
miss the Jeep. He stated that the Jeep then “caught” the dump truck’s left tire and
bounced off of it. Appellant said that the Jeep then rotated in front of him, and he
struck the Jeep from behind. When the State asked him if his version of the accident
had changed since he had given his grand jury testimony, appellant denied that it had
changed.
          Following appellant’s testimony, the State offered two rebuttal witnesses. One
of the witnesses was the assistance district attorney, who had taken appellant’s grand
jury testimony. According to the ADA, appellant had testified during the grand jury
proceedings that there had only been one impact between the dump truck and the
Jeep. Appellant had not testified, as he did at trial, that there had been a two-stage
collision.
          Lastly, the State recalled Deputy Pearson. The officer testified that the damage
to the Jeep was not consistent with appellant’s version of the incident. Deputy
Pearson further testified, “It would be physically impossible for that Jeep to overtake
the truck and rotate around in front of it and then have a subsequent collision at the
rear.”
          The jury found appellant guilty as charged in the indictment. This appeal
followed. Presenting two points of error, appellant challenges the legal and factual
sufficiency of the evidence supporting the judgment of conviction. 
 
Legal Sufficiency
          Appellant raises his legal-sufficiency challenge in his first point of error. 
A.      Standard of Review
          When reviewing the legal sufficiency of the evidence to support a conviction,
we determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. See Laster v. State, 275 S.W.3d
512, 518 (Tex. Crim. App. 2009) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979)). This standard gives full play to the responsibility of the
trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. See Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007). 
          Under the law, the trier of fact is the sole judge of the weight and credibility
of the evidence. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown
v. State, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). Thus, when performing a
legal-sufficiency review, we may not reevaluate the weight and credibility of the
evidence and substitute our judgment for that of the factfinder. Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Rather, we “determine whether the
necessary inferences are reasonable based upon the combined and cumulative force
of all the evidence when viewed in the light most favorable to the verdict.” Hooper
v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the
factfinder resolved any conflicting inferences in favor of the prosecution and defer
to that resolution. See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235
S.W.3d at 778.
B.      Law Governing the Offense
          A person commits criminally negligent homicide if he causes the death of
another by criminal negligence. Tex. Penal Code Ann. § 19.05(a) (Vernon 2003). 
Criminal negligence occurs when the person ought to be aware of a substantial and
unjustifiable risk that the circumstances exist or the result will occur. Id. § 6.03(d)
(Vernon 2003). The offense of criminally negligent homicide “involves inattentive
risk creation, that is, the actor ought to be aware of the risk surrounding his conduct
or the results thereof [but fails] to perceive the risk.” Stadt v. State, 182 S.W.3d 360,
364 (Tex. Crim. App. 2006) (quoting Lewis v. State, 529 S.W.2d 550, 553 (Tex.
Crim. App. 1975)). 
          The risk must be of such a nature and degree that the failure to perceive it
constitutes a gross deviation from the standard of care that an ordinary person would
exercise under all the circumstances, as viewed from the actor’s standpoint. Id. In
short, the State is required to prove that an accused’s failure to perceive a substantial
risk of death from his conduct grossly deviated from an ordinary standard of care. 
See Tello v. State, 180 S.W.3d 150, 156 (Tex. Crim App. 2005) (citing Graham v.
State, 657 S.W.2d 99, 101 (Tex. Crim. App. 1983) (explaining that criminal
negligence is “failure to perceive” risk of death from actor’s conduct which must rise
to level of “gross deviation” from an ordinary standard of care)).
          In addition, Code of Criminal Procedure article 21.15 requires the State to
plead, with reasonable certainty, the acts or circumstances on which the State will rely
to prove that the forbidden conduct was committed with the culpable mental state of
criminal negligence.


 See Tex. Code Crim. Proc. Ann. art. 21.15 (Vernon Supp.
2009); see State v. Sonnier, 773 S.W.2d 60, 62 (Tex. App.—Houston [1st Dist.] 1989,
no pet.). Article 21.15 serves to place the defendant on notice that he is charged with
criminal negligence and to specify the act or acts from which the State will ask the
factfinder to infer the required mental state. See Stadt v. State, 120 S.W.3d 428,
442–43 (Tex. App.—Houston [14th Dist.] 2003), aff’d, 182 S.W.3d 360 (Tex. Crim.
App. 2005). 
C.      Analysis
          Here, the indictment identified the following acts by appellant as constituting
criminal negligence: (1) failing to maintain a proper lookout for traffic conditions, (2)
operating his motor vehicle at an unsafe speed, (3) driving through a “right-turn only
lane,” (4) driving through a red light, and (5) taking improper evasive action. These
same five acts were disjunctively identified in the charge for the jury to consider
when determining whether appellant acted with criminal negligence.



          To support his legal-sufficiency argument, appellant contends as follows, “The
facts as proved did not demonstrate beyond a reasonable doubt that the actions of
Appellant which caused the collision in which the complainant was killed constituted
criminal negligence. The proof showed, at most, civil negligence.”
          The Court of Criminal Appeals considered a similar challenge in Tello v. State, 
180 S.W.3d at 150. There, the appellant, Tello, was towing dirt in a homemade trailer
when the trailer unhitched from his truck, and struck and killed a pedestrian. Id. The
evidence at trial showed that Tello had not secured the trailer to the truck with safety
chains, as required by state law, and that safety chains would have prevented the
accident. Id. at 151. The evidence also showed that the trailer hitch did not latch
properly and had been hammered and bent to make it latch. Id. at 152. The State’s
expert testified that the hitch was defective and that the defect was “obvious.” Id. 
Yet other evidence indicated that Tello had improperly loaded the dirt in the trailer,
which contributed to it coming unhitched. Id. at 153–54.
          During closing argument, Tello argued that the trailer had “never popped off
before.” Id. at 154. Tello conceded that he was negligent, but claimed that his
negligence did not rise to the level of criminal negligence. Id. 
          In its legal-sufficiency analysis, the Court of Criminal Appeals explained that
“[t]he State was not required to prove that appellant ‘had a problem with the trailer
becoming unhooked’ or that the trailer had ‘popped off before.’” Id. at 157. Rather,
“the State was required to prove that [Tello’s] failure to perceive a substantial risk of
death from his conduct grossly deviated from an ordinary standard of care.” Id. at
156. The court concluded, “[T]he evidence that the trailer hitch had been hammered
a number of times in an attempt to get it to latch properly and [the expert’s] testimony
that the hitch’s defects were ‘obvious’ support such a finding.” Id. The court
continued, “A jury could also rationally find that appellant should have, but failed,
to perceive a substantial and unjustifiable risk of death from his conduct of knowingly
using a faulty trailer hitch without safety chains on a public road.” Id. In a
unanimous decision, the court held that the evidence was legally sufficient to support
Tello’s conviction for criminally negligent homicide. See id.
          Judge Cochran wrote a concurring opinion “to emphasize the fine, but marked,
legal line between civil negligence and criminal negligence.” Id. at 158 (J., Cochran,
concurring). She explained that criminal negligence requires “a significantly greater
degree of deviation” from the standard of ordinary care than does civil negligence. 
Id. Such deviation must be “gross” or “extreme” and is measured solely by the degree
of negligence. Id. 
          Judge Cochran further explained, “Conduct that constitutes criminal negligence
involves a greater risk of harm to others” than does civil negligence.” Id. “A person
may be found criminally negligent when he inadvertently creates a substantial and
unjustifiable risk of which he ought to be (but is not) aware.” Id. A jury must
determine whether a defendant’s failure to perceive a substantial and unjustifiable
risk was, under all the circumstances, so grievous that the defendant should be held
criminally liable. See id.
          Importantly, despite the requirement that the risk be substantial and unjustified,
“criminal negligence does not require proof of the accused’s subjective awareness of
the risk of harm.” Id. Instead, “[i]t is a defendant’s awareness of the attendant
circumstances, not his subjective awareness of the risk of harm, that matters in
criminal negligence.” Id. 
          Judge Cochran observed that criminal liability was imposed on Tello “because
he should have been aware of the substantial risk of death that his failure to both note
and repair [the] numerous deficiencies [to the trailer hitch] entailed.” She concluded,
Had there been only a single deviation from the ordinary standard of
care, e.g., had appellant exercised ordinary care but for the failure to
attach a safety chain between the trailer and the truck, then his conduct
in “failing to properly secure a trailer to his truck” might constitute mere
simple civil negligence, not criminal negligence.

Id.
          Here, appellant relies on the case of People v. Boutin, 75 N.Y.2d 692, 555
N.E.2d 253 (1990) to support his legal-sufficiency challenge. Although a New York
case, Boutin is pertinent to our analysis because the Court of Criminal Appeals relied
on it in Tello to overrule Tello’s legal-sufficiency challenge and to affirm his
conviction. Tello, 180 S.W.3d at 157. 
          In Boutin, the New York Court of Appeals reversed a conviction for criminally
negligent homicide when the defendant—driving near, and possibly under, the speed
limit—struck a marked police car stopped in the right-hand travel lane of an interstate
on a rainy, foggy night. Boutin, 75 N.Y.2d at 698, 555 N.E.2d at 256. As set out by
the Tello court, the Boutin court provided the following description of New York’s
criminal negligence standard: 
Our decisions construing these provisions have emphasized that criminal
liability cannot be predicated on every act of carelessness resulting in
death, that the carelessness required for criminal negligence is
appreciably more serious than that for ordinary civil negligence, and that
the carelessness must be such that its seriousness would be apparent to
anyone who shares the community’s general sense of right and wrong
[citations omitted]. What, we believe, is abundantly clear from our
decisions and from the governing statutory language is that criminally
negligent homicide requires not only a failure to perceive a risk of death,
but also some serious blameworthiness in the conduct that caused it. 
The risk involved must have been “substantial and unjustifiable,” and
the failure to perceive that risk must have been a “gross deviation” from
reasonable care.
Tello, 180 S.W.3d at 157–58 (quoting Boutin, 556 N.Y.S.2d 1, 555 N.E.2d at 254). 
          Applying this standard, the Boutin court reasoned as follows in overturning the
defendant’s conviction:
 
[T]here is no question that defendant’s failure to see the vehicle stopped
in the lane ahead of him resulted in the fatal accident. That failure may
well constitute civil negligence. But the proof does not establish
criminal negligence. . . . [T]he evidence does not show that defendant
was engaged in any criminally culpable risk-creating conduct—e.g.,
dangerous speeding, racing, failure to obey traffic signals, or any other
misconduct that created or contributed to a “substantial and
unjustifiable” risk of death. Rather, it establishes only that defendant
inexplicably failed to see the vehicle until he was so close that he could
not prevent the collision. Though it resulted in two tragic deaths, that
unexplained failure, without more, does not constitute criminally
negligent homicide.
75 N.Y.2d at 697–98, 555 N.E.2d at 255–56. 
          Here, appellant contends that his case is “on all fours with Boutin.” Appellant
argues in his brief, 
[A]ccepting the state’s version of the facts, it was simply an unexplained
failure to see the stopped Jeep until he collided with it. Although it was
alleged that Appellant ran a red light[,] none of the witnesses stated that
Appellant drove through the red traffic signal before the collision. 
There was nothing per se negligent about driving in a right turn lane. 
Failing to maintain [a] proper lookout and failing to take evasive action,
the other theories alleged in the indictment, are simply the equivalent of
the situation in Boutin, i.e., failure to see a stopped vehicle before
colliding with it. 
          Contrary to appellant’s argument, this case does not involve an unexplained
failure to see a stopped vehicle, as in Boutin. Unlike Boutin, no evidence was
presented that appellant did not see the Jeep before he hit it. Appellant’s own
testimony does not support such contention. Appellant never testified that he did not
see the Jeep. In fact, he testified that he saw the Jeep. He disavowed fault by
claiming that the Jeep’s driver ran a red light. 
          We also disagree that a failure to take evasive action or to maintain a proper
lookout is necessarily the equivalent of failing to see a vehicle before colliding with
it, as a claimed by appellant. 
          In Boutin, the defendant driver and his passenger each expressly testified that
he did not see the parked police cruiser before the collision, despite its flashing lights. 
75 N.Y.2d at 694, 555 N.E.2d at 254. At the time of the collision, it was dark, rainy,
and foggy. Id. The police car was parked behind a disabled tractor trailer in a lane
of the interstate. Id. Here, the evidence showed that the accident occurred on a clear
day at 10:30 a.m. 
          Deputy Pearson testified that he could clearly see the intersection from 1,902
feet away. Chandra Kelly testified that she saw the Jeep sitting in the turn-only lane. 
Other witnesses testified similarly. The evidence further showed that other
southbound traffic was stopped at the light. Kelly also testified that she called out
appellant’s name three times to warn him of the impending collision, to no avail. 
Thus, the evidence is such that the jury could have reasonable inferred that an
ordinarily prudent driver, keeping a proper lookout, would have seen the Jeep stopped
in the right-turn-only lane. 
          Evidence was also presented from which the jury could have inferred that
appellant did not take evasive action by applying his brakes either before hitting the
Jeep or before running over Knetsar. Each witness, when asked, stated that he or she
had not heard appellant apply his air brakes. The forensic evidence, admitted through
the police officer’s testimony, also indicated that appellant had never applied his
brakes during the entire incident. 
          In addition, unlike in Boutin, the evidence at trial showed that appellant
engaged in additional “criminally culpable risk-creating conduct.” See Boutin,75
N.Y.2d at 697–98, 555 N.E.2d at 255–56. When viewed in favor of the verdict, the
evidence indicated that appellant’s light was red as he hit the Jeep and continued
through the intersection striking and killing Knetsar. The evidence also showed that
appellant was driving the 31,000 pound dump truck at a minimum speed of 37 miles
per hour in a right-turn-only lane against a red light. By doing so, appellant collided
with the Jeep and initiated the chain of events that resulted in Knetsar’s death. The
evidence further showed that appellant, with his specialized training, should have
been aware of the increased risk of this conduct given the size of his vehicle and its
decreased stopping abilities. Under the circumstances, the confluence of appellant’s
acts and omissions takes his conduct beyond the realm of simple civil negligence. 
See Tello, 180 S.W.3d at 158 (J., Cochran, concurring)
          Given the quantum of evidence discussed above, we conclude that the jury
could have rationally found that appellant should have perceived, but failed to
perceive, a substantial and unjustifiable risk of death from his conduct, as alleged in
the indictment. See Lopez v. State, 630 S.W.2d 936, 941 (Tex. Crim. App. 1982)
(determining that driver “ought to have been aware that a substantial and unjustifiable
risk was created when he exceeded the speed limit and ran a red light on a city
thoroughfare at 11:30 p.m.”). The jury also could have rationally found that
appellant’s failure to perceive this substantial and unjustifiable risk of death was
clearly a gross deviation from the standard of care that an ordinary person would
exercise under the circumstances. See Graham, 657 S.W.2d at 101 (concluding that
defendant driver’s failure to perceive risk of death from his conduct of speeding,
racing, and ignoring red light was clearly gross deviation from ordinary standard of
care). 
          In sum, we conclude that, based on the evidence when viewed through the
applicable prism of light, the jury could have found, beyond a reasonable doubt, that
appellant possessed the culpable mental state of criminal negligence when he caused
Knetsar’s death. See Laster, 275 S.W.3d at 518. We hold that the evidence is legally
sufficient to support the judgment of conviction. See Lopez, 630 S.W.2d at 941
(holding that evidence was legally sufficient to support criminally negligent homicide
conviction when defendant exceeded speed limit and ran red light); Todd v. State, 911
S.W.2d 807, 815 (Tex. App.—El Paso 1995, no pet.) (holding that evidence was
legally sufficient to support criminally negligent homicide conviction when defendant
had “traveled closely behind another car in excess of the speed limit and during rush
hour traffic, failed to watch the traffic in front of him, and failed to apply his brakes
before striking a stalled vehicle”); Brown v. State, 773 S.W.2d 65, 67 (Tex.
App.—Fort Worth 1989, pet. ref’d) (holding that evidence was legally sufficient to
support criminally negligent homicide conviction when defendant was driving at high
rate of speed, failed to slow down as he approached intersection, and failed to watch
traffic light); Thompson v. State, 676 S.W.2d 173, 178 (Tex. App.—Houston [14th
Dist.] 1984, no pet.) (holding that evidence was legally sufficient to support
criminally negligent homicide conviction when defendant drove her car at excessive
rate of speed in residential neighborhood near bus stop when children normally would
be on their way to school).
          We overrule appellant’s first point of error.
Factual Sufficiency
          In his second point of error, appellant contends that the evidence is factually
insufficient to support his conviction.
A.      Standard of Review
          When reviewing the factual sufficiency of the evidence to support a conviction,
we view all the evidence in a neutral light, favoring neither party, nor the explicating
verdict. See Neal v. State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. 2006). We then ask whether the evidence
supporting the conviction, although legally sufficient, is nevertheless so weak that the
factfinder’s determination is clearly wrong and manifestly unjust or whether
conflicting evidence so greatly outweighs the evidence supporting the conviction that
the factfinder’s determination is manifestly unjust. Lancon v. State, 253 S.W.3d 699,
704–05 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414–15, 417.
B.      Analysis
          Here, appellant limits his factual-sufficiency challenge to his assertion that the
State’s evidence was “so weak as to render the verdict manifestly unjust.” We are
mindful that, in conducting a factual-sufficiency review, we must consider the most
important evidence that the appellant claims undermines the jury’s verdict. See Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Appellant begins by pointing
out that the scene witnesses were “divided” with regard to whether appellant’s light
was red and that some witnesses did not know the color of the light. He also points
out that one scene witness testified, as appellant did, that appellant’s light was green. 
          A review of all the evidence reveals that, in addition to the testimony cited by
appellant, three witnesses, including his passenger, Chandra Kelly, testified
unequivocally that appellant’s light was red. Other witnesses testified that the
southbound traffic on Atascocita was stopped at the intersection from which the jury
could have reasonably inferred that the light was red.
          The testimony cited by appellant does not supply a basis in the record to show
that the evidence is so weak as to render the verdict manifestly unjust. Instead, such
evidence is the type that must be evaluated and weighed by the factfinder. See
Lancon, 253 S.W.3d at 707. A jury’s decision is not manifestly unjust merely
because it resolved conflicting views of the evidence in favor of the State instead of
appellant. See Cain v. State, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997). Here, the
jury was in the best position to weigh and evaluate the evidence with regard to the
color of the traffic signal, and we properly afford due deference to that determination. 
See id.
          Appellant also asserts that “there was no evidence that [he] ACTUALLY ran
a red light.” Although no witness testified specifically that appellant “ran a red light,”
at least one witness testified that appellant’s light was red at the moment he collided
with the Jeep. Two other witnesses testified that the light was red immediately before
the collision. Yet other testimony was given that the southbound traffic was stopped
at the time. From such evidence, the jury could have reasonably inferred that
appellant “ran a red light,” when, after hitting the Jeep, he then proceeded through the
intersection and ran over Knetsar. 
          Appellant further points out that it is undisputed that the speed limit on
Atascocita was 45 miles per hour. Appellant asserts that only Sergeant Pearson
offered testimony that appellant exceeded the speed limit. Other testimony estimated
that appellant was driving under, or at, the speed limit. Appellant points out that
some witnesses did not testify regarding his speed.
          A review of the record shows that the State did not base its allegation that
appellant acted with criminal negligence on the theory that appellant exceeded the
posted speed limit. Rather, in the indictment, it was alleged that appellant was
“operating his motor vehicle at an unsafe speed.” Given that the evidence showed
that appellant was driving a 31,000 pound dump truck between 35 and 50 miles per
hour in a right-turn-only lane against a red light, with a stationery Jeep sitting in his
path, the jury could have reasonably found that appellant was “operating his motor
vehicle at an unsafe speed.” This is true regardless of whether the jury believed
appellant’s testimony that he was traveling 35 to 37 miles per hour or believed
Sergeant Pearson’s estimate of 50 miles per hour. 
          Lastly, appellant asserts, “As noted in the discussion under point of error
number one, failure to keep a proper lookout and failure to take evasive action
constituted civil, not criminal negligence if the Tello-Boutin example is a guideline.” 
Appellant does not elaborate why this argument is more compelling as a factual-sufficiency challenge than it is as a legal-sufficiency challenge. In any event, we
disagree that such conduct cannot result in a finding of criminal negligence, as
discussed in our legal-sufficiency analysis. We further note that evidence of other
conduct, such as running the red light and operating at an unsafe speed, also
supported the jury’s criminal-negligence determination. 
          After reviewing all of the evidence in a neutral light, we cannot conclude that
the evidence supporting the conviction is so weak that the verdict seems clearly
wrong and manifestly unjust, as appellant contends. We hold that the evidence is
factually sufficient to support the judgment of conviction.
          We overrule appellant’s second point of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
 
 
Laura Carter Higley
Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Higley.

Publish. See Tex. R. App. P. 47.2(b).