

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00032-CR

_____

BEN CANNON WHERRY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. CR17-313

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

# MEMORANDUM OPINION

The State indicted Ben Cannon Wherry for manslaughter after he killed Jevon Ray Ford, Jr., in a traffic accident. A Rusk County jury acquitted Wherry of manslaughter, but convicted him of the lesser-included offense of criminally negligent homicide and assessed a sentence of six years' imprisonment. On appeal, Wherry argues that the evidence is legally insufficient to support the jury's finding of guilt and its conclusion that the offense was committed with a deadly weapon. Wherry also argues that the trial court erred in admitting two hearsay statements.

We conclude that legally sufficient evidence supports both the jury's finding of guilt and the deadly-weapon finding. We also conclude that Wherry waived error on the first hearsay statement and was unharmed by the admission of any hearsay in the second statement. That said, we find that the trial court mistakenly referred to Wherry's offense as a third-degree felony. As a result, we modify the trial court's judgment to reflect the correct degree of offense and affirm the trial court's judgment, as modified.

## I.    Background

At trial, several witnesses testified about the deadly accident on Highway 64 in a work zone, including Connie Flanagan. Flanagan testified that she saw an orange roadwork sign on the highway in what was normally a seventy-mile-per-hour zone. She was driving sixty-five miles per hour when Wherry's white sports utility vehicle (SUV) passed her vehicle in an unsafe manner going "really, really fast." After watching Wherry pass other cars in front of her, she turned to her passenger and predicted that Wherry would "cause a wreck sometime." Thirty to thirty-five

seconds later, as she was following road signs warning drivers to slow down, she saw Wherry's SUV "go airborne" after it slammed into a line of stopped cars.

Wherry hit Ford's car at seventy-one miles per hour and reduced it to a crushed "tin can." Due to the impact with Ford's car, Wherry's SUV flipped mid-air and landed sideways on the pavement. It was undisputed that Ford was killed by the accident, but Wherry managed to crawl out of his SUV.

The initial impact forced Ford's car into a second car that belonged to Danielle MacKenzie, who testified that road conditions were good just before the 9:00 a.m. accident. According to MacKenzie, her car was in a long line of stopped cars following "very visible" roadwork signs. MacKenzie testified that "[t]here were orange signs everywhere . . . on the right side of the road" warning of a flagger ahead. While waiting in line, MacKenzie "looked in [her] mirror . . . and . . . saw this white Tahoe coming full speed ahead." Anticipating the collision, MacKenzie turned her wheel so she would not hit the car in front of her and spun into the embankment on impact.

To establish criminal negligence, the State questioned many eyewitnesses about road conditions and the roadwork signs. MacKenzie's sister, Makeshia Smith, who was a passenger in MacKenzie's car at the time of the accident, testified that the highway was flat, that there were five or six cars stopped in front of them, and that they could see a flagger as they were stopped. James Harthcock, who was stopped in the middle of the line, testified that "[t]here was plenty of visibility" on the morning of the accident. According to Harthcock, Highway 64 had roadwork signs "every 500 feet . . . for like a mile, two miles before" the accident, including a "flagger warning and [a warning that cars] may have to stop ahead."

3

Testimony from other witnesses and video of the scene just after the accident showed that (1) the first sign read, "Work Area Ahead," and was followed by a few traffic cones on the edge of the road; (2) the second sign read, "Roadwork Ahead," and was embellished with two flags; (3) the third sign read, "Be Prepared to Stop"; (4) the fourth sign depicted a flagger ahead; and (5) all of the signs were large and bright orange. Along with MacKenzie and Harthcock, other drivers in the line, including Bryan Boyd, Carl Hedges, III, and Rodney Tatum, had no difficulty safely coming to a stop after seeing the large signs and the flagger holding a stop sign. Hedges also testified that there was a change in pavement signaling road construction or roadwork, and Boyd, who was directly in front of MacKenzie in the line, testified that he could see workers trimming trees.

As he crawled out of his wrecked car, Wherry had blood on his nose and told Hedges, "I'm pretty f***ed up." He began pacing and cursing and, according to Harthcock, kept saying he had "F'd up." Scott McCoy provided emergency medical services to Wherry at the scene. McCoy testified that Wherry was bleeding from his nose and had a few minor injuries, but was alert and oriented. According to McCoy, Wherry said he normally took a daily dose of Methadone, a drug used to treat addiction to narcotics. Wherry also told nurse Mandy Peace that he normally took Methadone and Lexapro, an antidepressant, when treated in the emergency room at East Texas Medical Center. Wherry tested negative for all illegal drugs and alcohol.

Renee Hawkins, a forensic toxicologist, testified that, although Methadone and Lexapro were legally prescribed to Wherry, and she could not say that he was intoxicated, the National Highway Traffic and Safety Administration warned that "Methadone may impair the mental and/or

4

physical abilities required for the performance of potentially hazardous tasks, and that the sedative effects of the drug may be enhanced by concurrent use of other CNS suppressants."

Dustin Nichols, a trooper with the Texas Department of Public Safety, spoke with witnesses at the scene and concluded that Wherry had passed Flanagan in an unsafe manner. Nichols determined that Wherry passed Flanagan either as he was on a bridge or immediately right after the bridge. Nichols explained, "It's actually illegal to pass on a bridge. . . . Also, just beyond that bridge starts a no-passing zone. So if [Wherry] either started on the bridge or passed after, he would have, at minimum, completed a pass in a no-passing zone."

Nichols' crash investigation also concluded that the roadwork signs were properly placed, that eleven cars had come to a safe stop while Wherry did not, and that the black box from Wherry's vehicle showed that Wherry applied no pressure on the brake any time before hitting Ford's car at seventy-one miles per hour. Nichols testified that, as a result of his accident reconstruction, for at least eight seconds before the accident, "[Wherry] was operating in a manner that he could not -- he did not perceive what was in front of him and what was about to happen." Nichols said Wherry approached the work zone at a reckless speed, failed to maintain proper distances from the cars in front of him, was not keeping a proper lookout at the time of the accident, and was driving on a suspended license.

Nichols confirmed that Wherry did not appear intoxicated. Nichols testified that Wherry said he was on the way to the Methadone clinic to get his daily dose of Methadone, which could only be administered on site. Wherry admitted that he was tired and did not sleep well the night before, but did not remember falling asleep during the accident.

5

At trial, Wherry testified that he travelled the same route on Highway 64 every day to the Methadone clinic, it was his normal routine to set his cruise control to the seventy-mile-per-hour speed limit, and he had never had to stop on the highway before. Wherry also testified that he had been on Methadone for six months, had not abused any drug during that period, and was not intoxicated on the day of the accident.

Although he agreed that he caused Ford's death, Wherry did not know if his conduct was reckless. Wherry testified he had trouble sleeping. He said he did not see the roadwork signs, did not remember passing Flanagan, and did not remember the collision. Wherry explained that he was aware of Methadone's side effects of dizziness and drowsiness, which prompted these questions from the State:

> Q. So you were aware of that risk, weren't you?
>
> A. I'm aware of everything.
>
> Q. When you're dizzy and you're driving, that's a risk, isn't it?
>
> A. Yes.
>
> Q. When you're lightheaded and even nauseous operating a motor vehicle, that's a risk, isn't it, sir?
>
> A. Yes.
>
> Q. And you were consciously aware of those risks, weren't you, sir?
>
> A. Everyone does it -- I mean, everyone takes those chances and --
>
> Q. Everyone takes those chances?
>
> A. Everyone -- I mean, it's life.
>
> . . . .

Q.      You would agree, at a minimum, sir, that you failed to perceive risk that day, correct?

A.      Yes.

Q.      And an ordinary person, an ordinary person would have been more careful and not failed to perceive that risk?

A.      Yes.

Q.      Do you agree with that part?

A.      Yes.

Although Wherry remembered nothing about the accident or the events leading up to it, he testified that he did not recall experiencing any Methadone side effects.

After hearing this evidence, the jury found that Wherry was guilty of the lesser-included offense of criminally negligent homicide.

## II.     Legally Sufficient Evidence Supports Both the Finding of Guilt and the Deadly-Weapon Finding

### A.      Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks*

opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### B. Legally Sufficient Evidence Supports the Finding of Guilt

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Wherry requested a jury submission on criminally negligent homicide as a lesser-included offense to the State's indictment for manslaughter. A person commits this offense "if he causes the death of an individual by criminal negligence." TEX. PENAL CODE ANN. § 19.05(a). Wherry does not dispute that he caused Ford's death. Instead, he challenges the mens rea element of the offense.[1]

"A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL CODE ANN. § 6.03(d). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "Criminal negligence does not require proof of [a defendant's] subjective awareness of the risk of harm, but rather [the defendant's] awareness of the attendant circumstances leading to such a risk."

---

[1]Wherry argues that nothing showed he should have been aware that the circumstances of the situation created a substantial and unjustifiable risk that Ford could die as a result of his conduct.

8

*Queeman v. State*, 520 S.W.3d 616, 623 (Tex. Crim. App. 2017) (quoting *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012)). "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193).

The Texas Court of Criminal Appeals "has acknowledged that, under the law, criminal negligence is different from ordinary civil negligence." *Id.* Civil negligence "means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." *Id.* (quoting *Tello v. State*, 180 S.W.3d 150, 158 (Tex. Crim. App. 2005) (Cochran, J., concurring)). "Conversely, '[c]onduct that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility, than does simple negligence.'" *Id.* (quoting *Montgomery*, 369 S.W.3d at 193). "The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong." *Id.* (citing *Montgomery*, 369 S.W.3d at 193). "The risk must be 'substantial and unjustifiable,' and the failure to perceive it must be a 'gross deviation' from reasonable care as judged by general societal standards by ordinary people." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193). "In finding a defendant criminally negligent, a jury is determining that the defendant's failure to perceive the associated risk is so great as to be worthy of a criminal punishment." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193). "The degree of deviation from reasonable care 'is measured solely by the degree of negligence, not any element

9

of actual awareness.'" *Id*. (quoting *Montgomery*, 369 S.W.3d at 193) (quoting *Tello*, 180 S.W.3d at 158 (Cochran, J., concurring)). "Whether a defendant's conduct involves 'an extreme degree of risk' must be determined by the conduct itself and not by the resultant harm." *Id.* (quoting *Williams v. State*, 235 S.W.3d 742, 753 (Tex. Crim. App. 2007)). "Nor can criminal liability be predicated on every careless act merely because its carelessness results in death or injury to another." *Id*. (quoting *Williams*, 235 S.W.3d at 753).

The question of when carelessness rises to the level of criminal negligence is not a simple one, but we are guided by the Texas Court of Criminal Appeals' opinion in *Queeman. Id. Queeman* addressed "whether a death caused by two driving errors—the failure to control speed and the failure to maintain a proper distance between vehicles—proves a gross deviation from the standard of care that an ordinary person would exercise under the circumstances." *Id.* at 619. There, Queeman was driving on a two-lane highway when his van rear-ended an SUV that was making a left turn off the highway onto an intersecting street. *Id.* The collision killed a passenger in the SUV. *Id.* The driver of the SUV testified that she could not remember whether her vehicle was stopped at the time of the accident and told investigators that she did not use her turn signal. *Id.* at 620. Queeman testified that he was driving the speed limit and attempted to avoid the collision, "but was unable to completely evade it." *Id.* An accident investigation determined that the SUV's brake lights were illuminated and that Queeman did not attempt to brake until just before or at the time he struck the SUV, but could not quantify Queeman's pre-impact speed. *Id.* at 620, 621. The San Antonio Court of Appeals found Queeman's unexplained failure to see the SUV insufficient to sustain a conviction for criminal negligence because it found (1) an inference

that Queeman failed to control speed could only be based on speculation and (2) Queeman did not engage in any misconduct such as failure to obey traffic signals, cell phone use, intoxicated driving, or unsafe lane changes. *Id.* at 621–22. As a result, the San Antonio court reversed Queeman's conviction.

In affirming the San Antonio court's decision, the Texas Court of Criminal Appeals rejected the conclusion that the evidence was insufficient to show that Queeman was speeding. *Id.* at 624. Instead, it found that Queeman was speeding, failed to maintain a safe distance, and was inattentive, but that there was no evidence he was "grossly negligent by speeding excessively over the speed limit" and "no evidence . . . that he was grossly negligent in terms of the length or reason for his inattention." *Id*. As a result, the court concluded that the evidence only presented a case of "ordinary negligence that stems from misjudging speed and distance that may result in civil liability for traffic collisions." *Id.* at 628.

*Queeman* sheds light on resolving the legal sufficiency issue in this case. When there is evidence of excessive speeding, inattention for an unreasonable amount of time, or "evidence that [the] appellant engaged in . . . more extreme, aggressive, or foolish driving acts than are ordinarily engaged in by drivers and [not] accepted as reasonable risks in exchange for the social utility provided," criminal negligence may be shown. *Id.* at 625, 631. Because there was evidence that Wherry's speed was excessive and he was inattentive for an unreasonable amount of time, we find that *Queeman*'s requirements to prove criminal negligence were met.

We begin by pointing out that the jury was free to reject Wherry's testimony that he saw no roadwork signs since there was evidence that Wherry was paying attention to the road. The

11

evidence showed that Wherry passed a sign that read "Work Area Ahead" before passing Flanagan while driving "really, really fast." It is possible that Wherry did not see that sign, but Wherry paid enough attention to the road to pass Flanagan by changing lanes and getting back in Flanagan's lane without incident. There was evidence that Wherry passed Flanagan in a no-passing zone either on or right after the bridge and the video recording of an officer's approach to the traffic site showed that there was another large roadwork sign just after the bridge. Thus, the jury could have found that Wherry was aware of the attendant circumstances—the second "Roadwork Ahead" sign—that could lead to the substantial and unjustifiable risk of collision causing injury or death if he became inattentive or was excessively speeding given the circumstances. *See id.* at 629 (failure to obey traffic signals can constitute criminally culpable risk creating conduct supporting a finding of criminal negligence) (quoting *People v. Boutin*, 555 N.E.2d 253, 256 (1990)).

Nichols testified that, instead of paying attention and slowing down in the work area, the black box from Wherry's vehicle showed that Wherry was inattentive for at least eight seconds before the accident. Given the evidence here, the jury could have concluded that Wherry's failure to perceive the risk of failing to reduce speed in the work zone while not paying attention to the road was a gross deviation from reasonable care when eleven other cars had seen the "very visible" signs and safely come to a stop.[2]

We find the evidence legally sufficient to show that Wherry ought to have perceived the risk of death surrounding his conduct, he failed to do so, and his failure constituted "a gross

---

[2]Alternatively, if the jury believed that Wherry saw no signs, it could have concluded that Wherry's failure to pay attention to the road, when the signs were "every 500 feet . . . for like a mile, two miles," before the flagger constituted gross negligence in terms of the length of his inattention.

12

deviation" from the standard of care that an ordinary person would exercise under all the circumstances viewed from the standpoint of a driver of an SUV. We therefore overrule Wherry's first point of error.

### C.     Legally Sufficient Evidence Supports the Deadly-Weapon Finding

The deadly-weapon enhancement provision applies to the offense of criminally negligent homicide. *Chambless v. State*, 368 S.W.3d 785, 789 (Tex. App.—Austin 2012), *aff'd*, 411 S.W.3d 498 (Tex. Crim. App. 2013). The offense of criminally negligent homicide is a state jail felony. TEX. PENAL CODE ANN. § 19.05(b). But due to the jury's deadly-weapon finding, the offense became punishable as a third-degree felony. TEX. PENAL CODE ANN. § 12.35(c)(1). Under the Texas Penal Code, a deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Supp.).

As a result, "anything, including a motor vehicle, which is actually used to cause the death of a human being is a deadly weapon." *Tyra v. State*, 897 S.W.2d 796, 798 (Tex. Crim. App. 1995) (finding that a car was a deadly weapon in the commission of involuntary manslaughter) (citing *Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex. Crim. App. 1992) (per curiam)); *see Pena v. State*, 522 S.W.3d 617, 627 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (finding that a vehicle was a deadly weapon in the commission of criminally negligent homicide). "This is necessarily so because a thing which actually causes death is, by definition, 'capable of causing death.'" *Id.* (citing TEX. PENAL CODE ANN. § 1.07(a)(17)(B); *Ex parte Beck*, 769 S.W.2d 525, 526–27 (Tex. Crim. App. 1989)); *see Plummer v. State*, 410 S.W.3d 855, 860 (Tex. Crim. App. 2013).

13

Here, it is undisputed that Wherry's SUV was used to cause Ford's death. For this reason, the evidence was legally sufficient to sustain the jury's deadly-weapon finding. We overrule Wherry's second point of error.

### III. Wherry Waived Error on the First Hearsay Statement and Was Unharmed by the Admission of Any Hearsay in the Second Statement

In his third point of error, Wherry argues that the trial court erred in overruling his hearsay objection to Nichols' testimony (1) that Flanagan told her passenger Wherry would cause an accident with his driving and (2) that Wherry passed Flanagan while on a bridge or immediately after getting off the bridge.[3] We find that Wherry waived his first hearsay argument. Assuming error on the second hearsay ground, we find that Wherry was not harmed by the admission of Nichols' testimony.

Nichols spoke to several witnesses at the scene of the accident and used the information gathered in those interviews in formulating his expert opinions related to the accident. Wherry lodged a hearsay objection as Nichols was about to testify about Flanagan's statements. The trial court overruled the objection, but gave the following jury instruction:

> Ladies and gentlemen, this witness may be telling you about what somebody said to him outside of court. I'm instructing you that to the extent that those statements form the basis of his opinion, you can consider it in that way. You cannot consider those statements for the truth of those statements.

---

[3]To the extent that Wherry raises a Confrontation Clause issue, we find it unpreserved. At trial, Wherry only raised a hearsay objection to Nichols' testimony. "[A] hearsay objection does not preserve error on Confrontation Clause grounds." *Smith v. State*, 494 S.W.3d 243, 255 (Tex. App.—Texarkana 2015, no pet.) (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004)); *see Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000), *superseded by statute on other grounds*.

14

After the jury heard the trial court's instruction, Nichols testified, "In listening to Ms. Flanagan's testimony, that she told me there on the scene and she reiterated it here in court, was that she told her [passenger], 'If he keeps driving like this, there's going to be a crash." He also said,

> I had somebody tell me that they observed the vehicle . . . that vehicle had passed them and had actually passed Ms. Flanagan in the same manner, and they continued and either passed Ms. Flanagan on the bridge, and Ms. Flanagan also had agreed to me that it was either on the bridge or right after the bridge.

As for the first hearsay complaint, we find that Wherry waived error, if any. "A party waives error regarding the erroneous admission of evidence if the same or substantially similar evidence has been previously admitted in the proceeding without objection." *Webb v. State*, 557 S.W.3d 690, 698 (Tex. App.—Texarkana 2018, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1); *Conrad v. State*, 10 S.W.3d 43, 46 (Tex. App.—Texarkana 1999, pet. ref'd)). Here, Flanagan testified in her direct examination that she turned to her passenger and predicted that Wherry's driving would "cause a wreck sometime." Wherry did not object to Flanagan's direct examination, which occurred well before Nichols' testimony. As a result, he waived his hearsay complaint, *see id.*, to Nichols' statement that Flanagan said, "If he keeps driving like this, there's going to be a crash."

Next, we find no harm from Nichols' testimony about interviews describing where Wherry passed Flanigan. "The admission of hearsay over proper objection . . . is nonconstitutional error." *Josey v. State*, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.) (citing *Broderick v. State*, 35 S.W.3d 67, 74 (Tex. App.—Texarkana 2000, pet. ref'd)). "The reviewing court must deem the error harmless if, after reviewing the entire record, the court is reasonably assured the error did not influence the jury's verdict or had but a slight effect." *Id.* (citing TEX. R. APP. P.

44.2(b)). "If the same or similar evidence is admitted without objection at another point during the trial, improper admission of the evidence will not constitute reversible error." *Id.* (citing *Broderick*, 35 S.W.3d at 74); *see Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

Well after the excerpted testimony, Nichols showed the jury photographs of the highway leading up to the accident scene and testified, "Here's the bridge that he passed on. Here's our no-passing zone starting on that bridge, completing on that bridge -- or after that bridge." Wherry failed to object to that testimony. Similar evidence was also admitted without objection during the following portion of Wherry's cross-examination:

> Q.     Yeah. You heard the testimony of other witnesses, subject to cross-examination in this courtroom this week, that you passed illegally near a bridge, on a bridge, in a no-passing zone before you got to the traffic-stopped flagman area, correct?
>
> A.     I heard them.
>
> Q.     You heard them?
>
> A.     Yes.
>
> Q.     But you can't really dispute it, because you don't remember, right?
>
> A.     Huh-uh. No.

The substance of Nichols' testimony about where interviewees said Wherry passed Flanagan was admitted elsewhere without objection, and the trial court specifically instructed the jury not to consider any hearsay statements for the truth of the matter asserted. As a result, Wherry was not harmed by the admission of any hearsay in Nichols' testimony. We overrule Wherry's third point of error.

16

**IV. We Modify the Judgment to Reflect the Correct Degree of Offense**

Last, we find, sua sponte, that the trial court's judgment requires modification. We have the authority to modify the judgment to make the record speak the truth, even if a party does not raise the issue. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.). "Our authority to reform incorrect judgments is not dependent on the request of any party, nor does it turn on a question of whether a party has or has not objected in trial court; we may act sua sponte and may have a duty to do so." *Rhoten*, 299 S.W.3d at 356; *see French*, 830 S.W.2d at 609.

As we stated before, criminally negligent homicide is a state jail felony, but punishment is enhanced within the third-degree felony range when there is a deadly-weapon finding. *See* TEX. PENAL CODE ANN. §§ 12.35(c)(1), 19.05(b). "[S]tatutes enhancing punishment ranges for the primary offense do 'not increase the severity level or grade of the primary offense.'" *Bledsoe v. State*, 480 S.W.3d 638, 642 n.11 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting *Ford v. State*, 334 S.W.3d 230, 234 (Tex. Crim. App. 2011)). The trial court's judgment incorrectly labels the level of Wherry's offense as a third-degree felony.

To make the record speak the truth, we modify the trial court's judgment to reflect that Wherry was convicted of a state jail felony, not a third-degree felony.

## V.     Conclusion

We modify the trial court's judgment to reflect that Wherry was convicted of a state jail felony.  As modified, we affirm the trial court's judgment.


Scott E. Stevens
Justice

Date Submitted:     September 12, 2019
Date Decided:       October 4, 2019

Do Not Publish