

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-20-00180-CR
_____

MARK DAVID SALLEY, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 33rd District Court
Burnet County, Texas
Trial Court No. 49118, Counts II and IV; Honorable J. Allan Garrett, Presiding

September 20, 2021

MEMORANDUM OPINION

Before PIRTLE and PARKER and DOSS, JJ.

Appellant, Mark David Salley, was charged by indictment with two counts of criminally negligent homicide,[1] a state jail felony, and two counts of manslaughter,[2] a

---

[1] TEX. PENAL CODE ANN. § 19.05(a), (b).

[2] TEX. PENAL CODE ANN. § 19.04(a), (b).

second degree felony, arising from the deaths of two individuals, Pamela Stewart and Dena Kolb, resulting from a motor vehicle accident caused by Appellant. Following pleas of not guilty, Appellant was convicted by a jury of the two counts of criminally negligent homicide and acquitted of the two counts of manslaughter. Punishment was assessed at two years confinement and a $10,000 fine on each count. The jury recommended that only the period of confinement be suspended in favor of five years community supervision. The trial court ordered the sentences and fines to run concurrently. By three issues, Appellant appeals contending (1) the evidence is insufficient to establish he was criminally negligent when he caused the fatal collision; (2) the trial court improperly permitted questioning regarding his prescribed medications; and (3) the trial court erred in imposing a cumulative fine of $20,000 in the conditions of his community supervision.[3] The State agrees that imposition of a $20,000 fine was erroneous and requests that this court modify the condition of Appellant's community supervision so as to require him to pay $10,000 rather than $20,000 as a condition of supervision.

We affirm the judgments of conviction for each count of criminally negligent homicide but remand the case to the trial court to modify condition 14(e) of the conditions of community supervision, which currently requires Appellant to pay a $20,000 fine, to reflect a requirement that he pay a fine of only $10,000.

---

[3] Originally appealed to the Third Court of Appeals, sitting in Austin, this appeal was transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001. Should a conflict exist between precedent of the Third Court of Appeals and this court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

BACKGROUND

Early in the morning hours of October 2, 2017, during the morning commute to work, Appellant caused a three-vehicle accident on Highway 29, a four-lane highway with no dedicated left turn lane. The accident resulted in two deaths. Testimony established that the scene of the accident is a dangerous intersection and that there are "a lot of crashes out in that part of the roadway."

At the time of the accident, the highway was dry and the sky was partly cloudy. Overall, weather and driving conditions were favorable. The posted speed limit on the highway is sixty-five miles per hour. At the site of the accident, the highway is a relatively straight road.

Appellant was driving a Dodge truck. The other vehicles involved were a Ford Focus (car) driven by Pamela Stewart and a Ford Escape (SUV) driven by Dena Kolb. Appellant and Stewart were both driving in a westerly direction on the inside lane of the highway with Stewart ahead of Appellant. Stewart had stopped in the inside lane to make a left turn onto a county road.[4] Appellant's truck struck Stewart's car from behind sending it into a ditch where it came to rest on the driver's side of the vehicle and up against a tree. The impact lifted the back of Appellant's truck and spun it around. The rear of the truck landed in the oncoming lane of traffic where it collided with Kolb's SUV which was traveling east on the highway. The SUV spun in the two easterly bound lanes and

---

[4] One witness to the accident testified the brake lights and left turn signal on Stewart's car were activated.

stopped in the direction of the opposite ditch from where Stewart's car had come to rest. Photos introduced into evidence depicted massive damage to all the vehicles.

According to a witness, the two separate impacts occurred simultaneously. Kolb died at the scene and Stewart died shortly after she was taken to the hospital. Appellant was airlifted to a hospital and treated for a concussion and a laceration to his head.

After the Texas Department of Public Safety concluded its investigation, Appellant was arrested on September 10, 2018, almost a year after the accident. He posted bond the following day. He was charged with two counts of manslaughter (Counts I and III) and two counts of criminally negligent homicide (Counts II and IV).

During trial, the State presented testimony from law enforcement officers, three witnesses to the accident, two forensic pathologists who performed autopsies on Stewart and Kolb, several DPS troopers trained in accident reconstruction, Appellant's bond supervision officer, and several other witnesses.

The defense presented testimony from Appellant, his significant other, his brother, an expert forensic engineer, a cardiologist, and numerous character witnesses. After the defense rested, the State presented rebuttal testimony from one of the DPS troopers.

The trial court's instructions to the jury included two counts of manslaughter (Counts I and III) and two counts of criminally negligent homicide (Counts II and IV). During deliberation, the jury sent a communication to the court inquiring about the penalties for criminally negligent homicide and manslaughter. The trial court provided a boilerplate response that it was not permitted to answer the question and reminded the

4

jury to follow the instructions given. After deliberating, the jury acquitted Appellant of the manslaughter counts but found him guilty of two counts of criminally negligent homicide.

Following the presentation of evidence during the punishment phase of trial, the jury again sent a communication to the court asking for the protocol if a unanimous decision could not be reached. The trial court again provided the boilerplate response. After further deliberation, the jury sentenced Appellant to two years confinement and a fine of $10,000 in each case with a recommendation of community supervision. The jury also recommended that only the term of confinement be suspended.

### APPLICABLE LAW

A person acts with criminal negligence "with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." TEX. PENAL CODE ANN. § 6.03(d). Criminal negligence involves inattentive risk creation in that the actor ought to be aware of the risk surrounding the result of his conduct. *Juneau v. State*, 49 S.W.3d 387, 392 (Tex. App.—Fort Worth 2000, pet. ref'd). "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (quoting *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012)).

5

To find a defendant criminally negligent, a jury determines that the defendant's failure to perceive the associated risk is so great as to be worthy of criminal punishment. *Queeman*, 520 S.W.3d at 623. Determining whether a defendant's conduct involves an extreme degree of risk must be determined by the conduct itself and not by the resultant harm. *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 753 (Tex. Crim. App. 2007)). Criminal liability cannot be predicated on every careless act merely because its carelessness results in death or injury to another. *Williams*, 235 S.W.3d at 753.

### ISSUE ONE—SUFFICIENCY OF THE EVIDENCE

The only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *See Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). We consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Queeman*, 520 S.W.3d at 622.

We give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

6

We compare the elements of the offense as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial and whether properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326.

**ANALYSIS**

By his first issue, Appellant challenges the sufficiency of the evidence to support his conviction. The State was required to prove that Appellant caused the deaths of Stewart and Kolb by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a). When criminal negligence is part of an offense, article 21.15 of the Texas Code of Criminal Procedure requires the State to allege in the charging instrument the act or acts relied on (the non-statutory manner and means) that constitute criminal negligence. TEX. CODE CRIM. PROC. ANN. art. 21.15. In Count II of the indictment, Appellant was charged with the following manner and means of causing Stewart's death:

> failing to keep a proper lookout for the vehicle occupied by Pamela Stewart or following the vehicle . . . too closely or driving the said motor vehicle at an unsafe speed or failing to control the speed of said motor vehicle or failing to maintain an assured clear distance . . . .

In Count IV of the indictment, Appellant was charged with the following manner and means of causing Kolb's death:

7

> failing to keep a proper lookout for the vehicle occupied by Pamela Stewart
> or following the vehicle . . . too closely or driving the said motor vehicle at
> an unsafe speed or failing to control the speed of said motor vehicle or
> failing to maintain an assured clear distance or failing to maintain a single
> lane of travel . . . .

Count IV added the additional manner and means of failing to maintain a single lane of travel. Additionally, the court's charge instructed the jury on the particular manner and means charged.

The State prosecuted Appellant on the theory that his conduct in causing the accident and resultant deaths was not simply the result of a mistake but rather the result of reckless conduct. The defense's strategy was that "accidents happen" at dangerous intersections. The defense also claimed there was no evidence of distracted driving and Appellant could only speculate that he may have "dozed off" or that a vehicle in front of him may have changed lanes at the last possible moment.

The State presented testimony from three witnesses to the accident. The first witness, Valerie Kreger, testified she was commuting to work on Highway 29 and traffic was "heavy" that morning. She was traveling on the inside lane behind Appellant. She observed him cross the dividing line of the highway on at least three occasions. For her own safety, she accelerated and moved to the outside lane to pass him. She saw Stewart's car stopped and assumed she was waiting to turn left. As soon as she had cleared Appellant's truck, she heard what sounded like an explosion and saw the accident in her rearview mirror. She pulled over and called 911. In response to questioning, she testified that she did not hear any honking or any squealing from tires braking.

8

During cross-examination, she testified that she was following Appellant on the inside lane because "he was making good time." At first, she observed Appellant weaving in his lane but when she saw his truck tires "penetrate" the "yellow line," she decided to drive around him.

Witness Roland Tatsch testified he was driving a "dually-truck" and pulling a gooseneck trailer. He merged onto Highway 29 from an intersecting lane and accelerated to fifty-five miles per hour. He was traveling in the same direction as Appellant and saw Appellant pass him on the inside lane. Tatsch admitted he was momentarily distracted by his phone and seconds later when he looked up, he saw the aftermath of the accident. According to Tatsch, the back end of Appellant's truck became airborne and the truck "twisted sideways" before hitting the ground and landing with the front end pointing south. Tatsch testified that after the accident, Kolb's SUV was sideways in the opposite lanes and Stewart's car landed in a ditch up against a tree. He pulled over and called 911. Just as Kreger testified, Tatsch confirmed he did not hear a horn honking or any tires squealing just prior to the accident.

The third witness to the accident, Steven Hinds,[5] testified he was driving to work in the same direction as Appellant on Highway 29. He was in the outside lane and Appellant was in the inside lane when they departed a controlled intersection simultaneously. Hinds observed Appellant's truck drift into his lane six to eight times for approximately five miles. He described the encroachment into his lane as "just a few

---

[5] Hinds testified he had recently completed a safety training course. He had an emergency vest in his vehicle which he put on to assist in the aftermath of the accident.

9

inches" and did not believe his vehicle and Appellant's truck would make contact. However, he eventually adjusted his speed to slow down and allow Appellant to pass him to avoid traveling side by side.

Hinds described the three-car accident as occurring "simultaneously." During direct examination, in response to questioning, he testified he did not hear squealing tires nor a horn and he did not see Appellant take any evasive measures to avoid impact. However, during cross-examination, he testified that Appellant "hit his brakes at the very last second" and made a "steering motion to the left" where he collided with Kolb's SUV coming from the opposite direction.[6] He saw that Stewart's car had come to rest on the driver's side in a ditch and saw Kolb's SUV spin out in the two opposite lanes. Appellant's truck came to rest near the center of the highway.

Hinds testified that prior to the accident, he saw Stewart's car stopped in the inside lane with the brake lights and left turn signal both activated.[7] In his opinion, "[i]t was obvious . . . that [Appellant] wasn't paying attention given our drive together." When asked if Appellant's inattention was clear because he failed to take evasive measures to avoid Stewart's stopped car, Hinds answered affirmatively.

The State also presented testimony from former DPS Trooper Jesse Strength.[8] He and his field training officer, Trooper Frank Randolph, responded to the call about a

---

[6] During redirect examination, Hinds again referred to Appellant making a slight evasive turn just before the accident.

[7] Former DPS Trooper Jesse Strength testified that based on his investigation, Stewart did not have her left turn signal activated.

[8] The defense objected to Strength's qualifications as an expert given his lack of experience. At the time of the accident, he was not yet certified as a peace officer and was on probationary status. He left

multiple vehicle accident. Trooper Randolph instructed Strength to "mark the scene." At trial, Strength opined that Appellant's conduct, whether inattention or distraction, caused a chain reaction that resulted in two fatalities.

According to Strength, his investigation showed that Appellant had not applied his brakes before the accident. His conclusion was based in part on the lack of skid marks from the tires of Appellant's truck. He testified the width of the skid marks did not match the truck tires. An accident reconstruction team member with the Texas Department of Public Safety likewise testified that the tires of Appellant's truck did not leave any skid marks.

During cross-examination, Strength testified he interviewed Appellant a few days after the accident. According to Strength, the investigation showed that Appellant did not commit an intentional act and surmised that without a better explanation, the cause of the accident had to be driver inattention. Strength pressed Appellant for information to determine the cause of the accident and in doing so, Appellant became nervous.

During the interview, Appellant reported to Strength that he had slept well the night before the accident and speculated another vehicle in front of him must have suddenly changed lanes at the last moment making it difficult for him to react to Stewart's stopped car. Strength testified there was no evidence to support Appellant's speculation that another vehicle in front of him had suddenly changed lanes. Additionally, Appellant

the Department before the investigation was completed. After voir dire examination, the trial court overruled defense counsel's objection.

claimed he could not remember details from the accident in the two years since the accident.

After Strength left his position with the Department of Public Safety, his field training officer, Trooper Randolph, took over the accident investigation.[9] He testified he had no concerns with Strength's investigation but also conducted his own investigation by interviewing the witnesses and studying reports and other documents. He agreed that the tires of Appellant's truck did not leave any skid marks. He also discredited Appellant's theory that a mystery car had suddenly changed lanes just prior to impact. Based on his investigation, he listed the following as contributing factors by Appellant: (1) failure to keep a proper lookout; (2) following too closely; (3) traveling at an unsafe speed; (4) failure to control speed; (5) failure to maintain a single lane of travel; and (6) traveling into oncoming traffic. Without an explanation for Appellant's conduct, Trooper Randolph opined that Appellant was reckless and negligent in causing the accident.

The State's final witness during its case-in-chief was Appellant's bond supervision officer. He testified that Appellant was added to his caseload on September 11, 2018, after posting bond. According to his testimony, during his discussion with Appellant regarding the allegations, Appellant speculated that he may have closed his eyes before the accident and possibly "nodded off."[10]

---

[9] The defense objected to Trooper Randolph's testimony as an expert witness. After voir dire examination, the trial court overruled the objection.

[10] In a recent decision by the Texas Court of Criminal Appeals, the Court held that an appellant was entitled to a lesser-included offense charge because, under the facts of that case, the jury could have found the defendant guilty of only the lesser-included offense of deadly conduct because the motor vehicle collision that resulted in the death of the other driver was a result of his involuntary (and therefore not reckless) loss of consciousness. *See Simms v. State,* No. PD-1248-19, 2021 Tex. Crim. App. LEXIS 783 (Tex. Crim. App. Sept. 15, 2021). No lesser-included offense instruction was requested here.

After the State rested, Appellant made an unsuccessful motion for directed verdict. Thereafter, the defense began its case-in-chief with Appellant testifying in his own defense. He testified to his routine on the evening before the accident. He went to bed at approximately ten o'clock and awoke at 5:30 a.m. on the morning of the accident. That morning, he was driving to a job site and was not running late. He testified he felt fine and was not tired or sleepy.[11]

Appellant had recently traveled Highway 29 once for work but had not regularly traveled the highway in a decade. Although there was no evidence that he was using his cell phone or was otherwise distracted, he testified he remembered "*looking up* and seeing a stopped vehicle" just ahead in his lane. He explained that he had speculated to his bond officer that because he could not remember anything, "[m]aybe I closed my eyes for a minute." Throughout his testimony, Appellant was resolute about not remembering the details of the accident.

During cross-examination, Appellant revealed, over objection, that he had been treated for depression and insomnia in September 2017, just weeks before the accident. He also testified, again over numerous objections, that he was taking prescription medications including Lipitor, Ambien, Meloxicam, Lexapro, Prilosec, and Soma. He testified that his medications did not make him drowsy.

---

[11] Later in the defense's case-in-chief, a cardiologist testified to a theory that perhaps Appellant had suffered a cardiac episode just before the accident. The doctor had never treated Appellant and only reviewed medical records to prepare for trial. Appellant's records showed that in February 2019, more than a year after the accident, Appellant was diagnosed with atrial fibrillation. The doctor, however, could not opine that Appellant suffered a cardiac episode before the accident.

Appellant denied that he was drifting or weaving in his lane before the accident and claimed he had taken evasive measures just before the accident by applying his brakes and turning to the left. When asked why he had told his bond officer that he "nodded off," he testified he was speculating and insisted that the words he used were "dozed off." He also claimed that he was speculating when he told law enforcement officers that a vehicle in front of him had suddenly changed lanes.

Appellant presented testimony from Dr. Eric Moody, a forensic engineer and an accident reconstructionist. He reviewed accident reports, photos, diagrams, and data from the vehicles.[12] Although he testified that he agreed with the way Strength had marked the accident scene, he disagreed with Strength's conclusion on the skid marks. Dr. Moody concluded that long skid marks (seventy-five feet), which he attributed to the tires of Appellant's truck, indicated that Appellant had made an evasive maneuver just prior to impact.

During his testimony, Dr. Moody focused on the human factors of detection, perception, and reaction to a situation rather than on the contributing factors to the accident addressed during the State's case-in-chief. According to Dr. Moody, Appellant did not have advance warning of a stopped car on the highway and failed to detect and perceive the situation which resulted in a failure to react in time to avoid impact. When asked if Appellant was negligent in failing to timely detect, perceive, and react, Dr. Moody

---

[12] He did not have direct access to the vehicles involved so he referred to general information about the types of vehicles involved.

answered, "[t]hat's correct." He would not, however, categorize Appellant's conduct as gross negligence or recklessness.

The remainder of the defense's case included numerous witnesses, including his significant other of over twelve years and his brother. They all testified to Appellant's good reputation and character.

After the defense rested, Trooper Randolph testified as a rebuttal witness. He explained that traveling at an unsafe speed or being unable to control speed are not indications of speeding. Rather, an unsafe speed is determined from the surrounding circumstances. For example, even though Appellant was not speeding according to the posted speed limit of sixty-five miles per hour, he was traveling at an unsafe speed and failed to control his speed when he failed to avoid striking Stewart's stopped car. Trooper Randolph also rebutted Dr. Moody's opinion that the tires of Appellant's truck left seventy-five-foot skid marks. According to Randolph, such lengthy skid marks could not have been made without causing screeching or squealing tires and the three witnesses to the accident all testified they did not hear any squealing sounds.

Appellant relies heavily on *Queeman v. State* to obtain a reversal of his conviction and a judgment of acquittal. He contends there is no evidence to show he was engaged in risky behavior that was substantial and unjustifiable. *Queeman* similarly involved a fatal rear-end collision when a vehicle stopped to make a left turn was struck by Queeman. Although the speed involved was significantly less than in the instant case, the collision nevertheless resulted in the death of the individual in the stopped vehicle. Queeman was convicted for criminally negligent homicide for failure to control speed and

15

failure to maintain a proper distance. *Queeman*, 520 S.W.3d at 619. On direct appeal, Queeman's conviction was reversed and a judgment of acquittal was entered based on insufficient evidence of whether he was "engaged in any criminally culpable risk-creating conduct . . . or any other misconduct that created or contributed to a 'substantial and unjustifiable' risk of death." *Queeman v. State*, 486 S.W.3d 70, 77 (Tex. App.—San Antonio 2016) (citations omitted). The Court of Criminal Appeals agreed the evidence was insufficient to support Queeman's conviction. *Queeman*, 520 S.W.3d at 619.

*Queeman* is, however, distinguishable from Appellant's case. Queeman was charged with two non-statutory manner and means of committing the offense whereas Appellant was charged with numerous manner and means of causing the accident. Queeman claimed he was traveling at thirty-six to thirty-seven miles per hour in a forty-mile-per-hour zone. The trooper investigating the accident testified that Queeman was "traveling '*significantly*' faster than 36 or 37 miles per hour." *Id.* at 620. He did not, however, quantify or explain what he meant by "significantly." *Id.* at 625. Neither was the evidence sufficient to show the length of or reason for Queeman's inattentiveness that caused the accident. *Id.* at 626.

In its analysis, the Court determined that Queeman was speeding and was inattentive; however, in its lengthy examination of the case, the Court found insufficient evidence to elevate the case from one of ordinary civil negligence to criminal negligence without engaging in speculation. *Id.* at 630. The Court concluded there was no evidence of a failure to perceive a substantial and unjustifiable risk that constituted a gross deviation from the standard of care an ordinary person would have exercised under the same circumstances. *Id.* at 631.

16

Here, the evidence showed that on the morning of the accident, Highway 29 was congested with traffic. The posted speed limit is sixty-five miles per hour. Multiple witnesses testified that Appellant drifted in his lane numerous times and even crossed the yellow line into oncoming traffic on several occasions. One witness testified that he observed Appellant engage in such conduct over a five-mile stretch of the highway. The witnesses all took measures to either accelerate and pass Appellant or slow down to avoid traveling beside his truck. One witness testified "[i]t was obvious . . . that [Appellant] wasn't paying attention . . . ."

Appellant himself testified that he speculated he had "dozed off." His bond officer also testified that Appellant had reported to him that he may have closed his eyes before the accident or "nodded off." During his testimony, Appellant indicated he had "looked up" just before realizing that Stewart's car was stopped ahead. His words indicate his eyes were not focused on the highway just prior to the accident.

Conflicting evidence was offered on whether Appellant applied his brakes and made an evasive slight turn to the left when he saw Stewart's car stopped on the highway. There was also conflicting evidence on whether Stewart had activated her left turn signal. Experts offered conflicting evidence on whether skid marks at the scene were made by the tires on Appellant's truck. The jury, as the trier of fact, was free to resolve any conflicts and did so in the prosecution's favor.

Appellant's expert, Dr. Moody, testified that Appellant was negligent, but not reckless, in failing to detect, perceive, and react to Stewart's stopped car. The jury agreed with the expert's opinion and rejected a conviction for manslaughter. However, the jury

17

determined that Appellant's failure to perceive the risk was so great as to be worthy of criminal punishment and convicted him of the offense of criminally negligent homicide.

The State established beyond a reasonable doubt that Appellant's conduct caused the deaths of Stewart and Kolb. It also established that Appellant ought to have been aware of a substantial and unjustifiable risk of death from his conduct. Testimony established that Appellant was weaving on the highway for approximately five miles before the accident and he speculated that he had "dozed off" as a reason for his untimely reaction to Stewart's stopped car. The evidence showed that Appellant failed to keep a proper lookout and, although he was not speeding, he failed to maintain a safe speed or control his speed under the circumstances—heavy traffic during an early morning commute on a highway with a posted speed limit of sixty-five miles per hour and without a dedicated left turn lane. Based on the evidence presented, the jury was free to reasonably infer that Appellant fell asleep at the wheel—conduct that he ought to have known presented a risk of such a nature and degree that his failure to perceive it constituted a gross deviation from the standard of care that an ordinary person would have exercised under all the circumstances when viewed from his standpoint.

Unlike in *Queeman*, here, the evidence presented by the State was sufficient to elevate Appellant's case from one of ordinary civil negligence to criminal negligence. Viewing the evidence in the light most favorable to the verdict, we conclude the jury found all the essential elements of criminal negligence beyond a reasonable doubt. Issue one is overruled.

18

**ISSUE TWO—ADMISSIBILITY OF EVIDENCE**

By his second issue, Appellant challenges an evidentiary ruling by which the trial court allowed questioning regarding his prescription medications even though the indictment did not allege that he was under the influence of any drug at the time of the accident. The State contends the issue was not preserved for review because Appellant failed to obtain a ruling on one of his objections. Alternatively, the State asserts the admission of evidence of Appellant's prescription medications, if error, was harmless.

An appellate court reviews a trial court's ruling on the admission of evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer*, 569 S.W.3d at 669 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). The trial court does not abuse its discretion if the decision to admit or exclude the evidence is within the zone of reasonable disagreement. *See Rhomer*, 569 S.W.3d at 677. If the trial court's evidentiary decision is supported by the record and there is any theory of law that would support the ruling, it is not an abuse of discretion. *See Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Evidence is relevant if it tends to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. TEX. R. EVID. 401. To be admissible, evidence must be relevant. TEX. R. EVID. 402. Even if evidence is relevant, the trial court may exclude the evidence "if its probative value is substantially outweighed by a danger of unfair prejudice." TEX. R. EVID. 403. Evidence

19

is unfairly prejudicial when it has an undue tendency to suggest an improper basis for reaching a decision. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g).

### ANALYSIS

Appellant filed a pretrial motion in limine asking, among other things, that the State not reference any "evidence regarding drugs or prescription medications that [he] took or that [were] found on scene." The motion was granted. It is well-settled that a motion in limine, whether granted or denied, preserves nothing for appellate review. *See Griggs v. State*, 213 S.W.3d 923, 926 n.1 (Tex. Crim. App. 2007). Instead, there must be a proper objection to the proffered evidence. *McDuff v. State*, 939 S.W.2d 607, 618 (Tex. Crim. App. 1997) (citing *Basham v. State*, 608 S.W.2d 677, 679 (Tex. Crim. App. 1980)).

During cross-examination, the prosecutor asked Appellant if he was on "any type of medication." An objection by defense counsel was sustained by the trial court "until it becomes relevant." Appellant then confirmed that he was being treated for depression and insomnia and the prosecutor again asked about "the list of medications" and defense counsel again objected. The trial court announced that because the State had not alleged any kind of intoxication, questions could be asked about medications but "you can't link anything up until we approach again." Defense counsel announced his objection "to any mention of medication at all" as being highly prejudicial and not alleged in the indictment. After a colloquy on the issue, the trial court announced as follows:

> Here is what we're going to do: You can ask the question, all right, and if there is - - if they need to pose an objection, make the objection. And then if we need to go outside the presence of the jury to clarify everything, we will.

Defense counsel again objected and the trial court announced, "[i]t's noted."

Appellant's testimony continued and he answered questions regarding his medications. When asked whether any of the medications can cause drowsiness, he testified "I don't get drowsy, sir." Later in his cross-examination, he was reminded that he mentioned to his bond supervision officer that he "might have nodded off" before the accident but he had difficulty remembering the details of the accident. He clarified that he was "speculating" to his supervision officer that he may have "dozed off."

At the conclusion of the prosecutor's cross-examination, defense counsel moved for a mistrial arguing that the State had violated the motion in limine by questioning Appellant about his medications over objection and the trial court's ruling. Defense counsel renewed objections to that line of questioning. Outside the jury's presence, both sides argued their respective positions after which the trial court denied the motion for mistrial. Defense counsel then requested an instruction to the jury to disregard any evidence regarding Appellant's prescribed medications and that such testimony be stricken from the record. The trial court also denied that request. Defense counsel then strategized that he would also need to question Appellant on his medications to respond to the State's line of questioning. Defense counsel explained as follows:

> so the record is clear, I don't want the court of appeals saying, "Well, you have waived your objection to all that by proceeding with your own questions and answers." Once again, we are by no means waiving, foregoing, surrendering, abandoning our objections nor our request for the jury to be instructed to disregard and for a mistrial.

The State suggests that Appellant failed to obtain a ruling on one of defense counsel's objections when the trial court announced, "[i]t's noted." The State also contends that Appellant procedurally defaulted his issue by failing to request a running objection.

We assume for the sake of argument that Appellant did properly preserve his complaint regarding questioning on his medications. *See Stinson v. State*, No. 05-07-01236-CR, 2009 Tex. App. LEXIS 3186, at *1-2 (Tex. App.—Dallas May 8, 2009, no pet.) (mem. op., not designated for publication) (concluding that error was preserved when the trial court ruled on appellant's objections made at a hearing on a motion in limine held before opening statements). After the various discussions on questions regarding Appellant's medications, the trial court was aware of the nature of Appellant's complaint. *See Alikhan v. Alikhan*, No. 03-19-00515-CV, 2021 Tex. App. LEXIS 5832, at *11 (Tex. App.—Austin July 22, 2021, no pet.) (mem. op.) (citing *AIS Servs., LLC v. Mendez*, No. 05-07-01224-CV, 2009 Tex. App. LEXIS 6794, at *4-5 (Tex. App.—Dallas Aug. 27, 2009, no pet.) (mem. op.) (noting that essential element of an implicit ruling is awareness by the trial court of the complaint supposedly being ruled on). That said, for the following reasons, we find that error, if any, in allowing the line of questioning on Appellant's medications was harmless.

We review a trial court's evidentiary ruling for harm under Rule 44.2(b) of the Texas Rules of Appellate Procedure as non-constitutional error. Tex. R. App. P. 44.2(b). In our review, we disregard non-constitutional error unless it affected the substantial rights of the accused. *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); *Crim v. State*, No. 03-19-00445-CR, 2020 Tex. App. LEXIS 9729, at *11 (Tex. App.—Austin Dec. 11, 2020, pet. ref'd) (mem. op., not designated for publication). An accused's substantial

rights are "affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). Conversely, such an error is harmless if the reviewing court is reasonably assured that the error did not influence the verdict or had but a slight effect. *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005).

Several non-exclusive factors to consider in conducting a harm analysis under Rule 44.2(b) include (1) the nature of the error, (2) whether or to what extent the erroneously admitted evidence was emphasized by the State, (3) the probable collateral consequences of the error, and (4) how much weight the jury is likely to place on the erroneously admitted evidence during deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011).

In the underlying case, during direct examination, Appellant testified that he may have told his bond supervision officer "[m]aybe I closed my eyes for a minute." During cross-examination, he testified that in 2017, he was treated for depression and insomnia. His medications included Lipitor for cholesterol, Ambien for sleep, Meloxicam for arthritis, Lexapro for depression, and Soma, a muscle relaxant. He testified that his medications did not make him drowsy. Also, during cross-examination, he testified that he "dozed off" and did not see Stewart's car stopped ahead of him. But he claimed that he speculated he "dozed off" because he had difficulty remembering specifics about the accident. Appellant's bond supervision officer also testified that Appellant had speculated to him that he "nodded off" while driving.

Additionally, the State placed little emphasis on Appellant's medications in its closing arguments. The only reference to Appellant's medications was that "Soma, Lexapro, Ambien" are "consistent with nodding off." Because Appellant told his bond supervision officer that he possibly "dozed off" before the accident and speculated during his testimony that he may have closed his eyes before the accident, any questioning regarding his medications and whether some of them could cause drowsiness was rendered harmless. After examining the entire record, we have fair assurance that error, if any, did not have a substantial or injurious effect or influence on the jury's verdict. Issue two is overruled.

### ISSUE THREE—CONCURRENT FINES

Appellant contends the trial court erred in imposing a cumulative fine of $20,000 when his convictions arose from the same criminal episode. Although he frames his complaint as an assessment of "two $10,000 fines consecutively," the written judgments reflect that the sentences shall run *concurrently*. Appellant filed a written objection to the assessment of the two fines and also moved to modify condition 14(e) of his community supervision to reflect a total fine of $10,000 and not $20,000. The State agrees that condition 14(e) should be modified to reflect that Appellant be assessed a fine of only $10,000 and notes that the written judgments do not require modification because the fines are to be paid concurrently and not consecutively. We agree.

Section 3.03 of the Texas Penal Code provides that when an accused is found guilty of more than one offense arising from the same criminal episode prosecuted in a single criminal action, a sentence for each offense shall be pronounced and generally, the sentences shall run concurrently. TEX. PENAL CODE ANN. § 3.03(a). Fines which are

part of concurrent sentences run concurrently. *See State v. Crook*, 248 S.W.3d 172, 176-177 (Tex. Crim. App. 2008). *See also Alexander v. State*, Nos. 03-16-00074-CR, 03-16-00075-CR, 2016 Tex. App. LEXIS 10338, at *2-3 (Tex. App.—Austin Sept. 22, 2016, pet. ref'd) (mem. op., not designated for publication) (modifying judgments to reflect that fines run concurrently).

### ANALYSIS

Here, the two separate judgments reflect that Appellant's sentences shall run concurrently. Thus, there is no error in the second judgment on Count IV that also reflects a concurrent fine of $10,000. However, the trial court did err in imposing as a condition of community supervision that Appellant pay a total fine of $20,000. Although this court does have authority to reform judgments, it does not have authority to modify conditions of community supervision. The State references Rules 43.2 and 43.6 of the Texas Rules of Appellate Procedure as authority for permitting this court to amend Appellant's conditions of community supervision.[13] However, only the court in which a defendant is tried has authority to modify conditions of community supervision. *See* TEX. CODE CRIM. PROC. ANN. art. 42A.051(b). Therefore, we remand the cause to the trial court for modification of condition 14(e) of Appellant's conditions of community supervision. Issue three is overruled as it relates to Appellant's request to reform the *Judgment* on Count IV to delete assessment of the fine but is sustained as to the error presented in condition 14(e) of the conditions of his community supervision.

---

[13] Rule 43.2(b) gives this court authority to modify and affirm a trial court's judgment. TEX. R. APP. P. 43.2(b). Rule 43.6 provides that this court "may make any other appropriate order that the law and the nature of the case require." TEX. R. APP. P. 43.6.

**CONCLUSION**

The trial court's judgments are affirmed. However, the cause is remanded to the trial court so that condition 14(e) of Appellant's community supervision may be corrected to reflect assessment of a total fine of only $10,000.


Patrick A. Pirtle
Justice


Do not publish.